1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In the Matter of the Application of LUFTHANSA TECHNIK, Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery, Pursuant to the Federal Rules of Civil Procedure, of Respondent Panasonic Avionics Corporation for Use in Foreign Proceedings. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

No. 2:17-cv-1453

APPLICATION FOR DISCOVERY IN AID OF FOREIGN LITIGATION PURSUANT TO 28 U.S.C. § 1782

NOTE ON MOTION CALENDAR: OCTOBER 20, 2017
ORAL ARGUMENT REQUESTED

Petitioner Lufthansa Technik AG ("Lufthansa") makes this application for an order

pursuant to 28 U.S.C. § 1782 authorizing its attorneys to issue subpoenas, pursuant to Federal

Rule of Civil Procedure 45, upon Respondent Panasonic Avionics Corporation ("Panasonic")

compelling it to produce documents for use in Civil Law Proceeding No. 7 O 289/10 (Mannheim

Regional Court), currently pending in Germany ("the German Action").

## JURISDICTION

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as it arises under

Federal law; specifically 28 U.S.C. § 1782.  *See United Co. Rusal PLC v. Trafigura A.G.*, No.

3:11mc17 (SRU), 2011 WL 1045532 (D. Conn. Mar. 16, 2011).  This Court also has jurisdiction

pursuant to 28 U.S.C. § 1332(a) because it is between a citizen of a State, Panasonic, and a

citizen of a foreign state, Lufthansa.

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) - 1

**THE GERMAN ACTION**

2.     On December 29, 2010, Lufthansa initiated the German Action in a district court in Mannheim, Germany (the "Mannheim Court"), to stop Astronics Advanced Electronic Systems ("AES"), from infringing Lufthansa's European Patent No. EP 881 145 and its German publication No. DE 598 10 238 (collectively, "EP 145 Patent"). (Declaration of Gerd Jaekel ("Jaekel Decl.") ¶ 11 & Exs. A-B, attached hereto as Ex. 1.)

3.     By that civil action, Lufthansa sought an injunction to stop any further harm from AES's infringement and to obtain damages for AES's past infringement. (*Id*. ¶ 12.)

4.     On June 20, 2011, AES served Lufthansa with a formal response to the complaint, giving Lufthansa notice of AES's defenses in the German Action. (*Id*. ¶ 13.) AES disputed Lufthansa's infringement claims arguing that many of the accused power supplies do not satisfy all of the claim limitations in EP 145 Patent. (*Id.* ¶ 14.) AES also asserted a defense based on the license granted to DaimlerChrysler Aerospace Airbus GmbH K.I.D. Systeme, now known as K.I.D. Systeme GmbH ("K.I.D.") (*Id.* ¶ 15.)[1]

5.     German patent cases are typically bifurcated so that infringement issues and invalidity issues are decided by different courts. (*Id.* ¶ 16.) Lufthansa's case was bifurcated in this manner. (*Id.*) In particular, on June 17, 2011, AES initiated nullity proceedings challenging the validity of the EP 145 Patent in the Federal Patent Court. (*Id.*) The Mannheim Court retained jurisdiction over the infringement portion of the case. (*Id.*)

6.     On November 14, 2011, the Mannheim Court stayed the infringement action until the Federal Patent Court rendered a decision regarding AES's nullity arguments. (*Id.* ¶ 17.)

---

[1] Lufthansa came before this Court in 2011, seeking discovery from AES under Section 1782. *In re Lufthansa Technik AG*, No. C11-1386-JCC (W.D. Wash. July 22, 2011). On October 6, 2011, Judge Coughenour granted Lufthansa's request with respect to most of the requested discovery, but declined to grant discovery relating to damages at that time and before the German court had ruled on liability. (Dkt. No. 21.) As discussed herein, the German court has now ruled and found AES liable for infringing Lufthansa's patent. Lufthansa's request for discovery from Panasonic to support its damages claims is ripe for this Court's consideration. *See* Notice of Related Case, filed concurrently herewith.

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) - 2

7.     On December 18, 2013, the Federal Patent Court decided mostly in Lufthansa's favor.  (*Id.* ¶ 18.)  In particular, it held that a combination of the challenged claims regarding the EP 145 Patent was valid.  (*Id.*)  On November 9, 2016, AES withdrew its appeal at the Federal Supreme Court, so that the decision as to validity has now become final.  (*Id.*)

8.     On February 6, 2015, the Mannheim Court held that AES had infringed the EP 145 Patent and rejected AES's infringement defenses.  (*Id.* ¶ 19.)  On November 14, 2016, the Karlsruhe Higher Regional Court affirmed this decision and decided that a further appeal to the Federal Supreme Court should not be certified.  (*Id.*)  AES filed a petition seeking leave to appeal to the German Federal Supreme Court.  (*Id.*)  In less than 8% of such petitions, the Federal Supreme Court admits the case for further appeal.  (*Id.*)  AES's petition is currently pending.  (*Id.*)

9.     At present, Lufthansa's damages claim is ripe:  The damages determination has not been stayed pending the petition for discretionary review.  Lufthansa is actively pursuing the damages issue in the Mannheim Court.  (*Id.* ¶ 20.)

10.    Lufthansa claims that AES's use of its patented technology has caused it damage in the range of millions of euros.  (*Id.* ¶ 25.)

11.    Lufthansa brings this Petition to discover evidence to support its claim for damages from AES in Germany.

12.    A European patent must be enforced in each designated state independently.  (*Id.* ¶ 38.)  In addition to Germany, Lufthansa's EP 145 Patent is in force in France, Spain, and the United Kingdom.  (*Id.*)  Lufthansa also owns a patent similar in scope to the EP 145 Patent in Japan (Patent No. JP 38888704 B2).  (*Id.*)  Lufthansa has suspected the possibility that AES has shipped its infringing product to these other countries as well.  (*Id.*)  Lufthansa has not been able to obtain all relevant evidence of those potential sales, however, and, without such evidence, it cannot reasonably bring infringement suits in those countries.  (*Id.*)

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) - 3

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington  98104
(206) 622-2000

13.     If Lufthansa obtains the requested evidence in this matter and it establishes that AES is committing infringing acts in those countries, Lufthansa reasonably contemplates bringing actions in France, Spain, the United Kingdom and/or Japan.  These actions are referred to collectively as the "Contemplated Foreign Proceedings."

## FACTUAL BACKGROUND

14.     Lufthansa is one of the leading manufacturers and independent providers of maintenance, repair, overhaul, and modification services in the civil aviation industry.  (Jaekel Decl. ¶ 3.)  With tailored maintenance programs and state-of-the-art repair methods, Lufthansa ensures the unbroken reliability and availability of its customers' fleets.  (*Id.*)  Lufthansa is an international organization involved in maintenance, production, and development.  (*Id.*)

15.     In the manufacture and marketing of its patented technology, Lufthansa works with its licensee, K.I.D.  (*Id.* ¶ 4.)  K.I.D. manufactures the patented power supplies for use in aircraft cabins under license with Lufthansa, and Lufthansa receives a per-unit royalty from K.I.D. for those power supplies sold by K.I.D.  (*Id.* ¶ 5.)

16.     Lufthansa's EP 145 Patent, entitled "Electrical Power Supply Device," issued on November 26, 2003.  (*Id.* ¶ 7.)  The patent claims technology that, for the first time, enabled a standard household voltage supply to be provided in the cabin of an aircraft to supply electricity to allow passengers to use their laptops or electronic entertainment devices in flight.  (*Id.*) Before the patented invention, aviation authorities took the view that placing a plug socket in a passenger seat, for example, posed a safety risk because a passenger might inadvertently insert conductive material into the socket and receive an electric shock.  (*Id.*)  The risk was particularly acute for young travelers, who might insert a sharp object into the plug socket.  (*Id.*)

17.     The technology in the patent incorporates safety features to prevent the possibility of electrical shock.  (*Id.* ¶ 8.)  *Specifically*, the patented technology ensures that power is supplied to a plug socket only if both pins are inserted into the socket simultaneously.  (*Id.*) Only when two pins are detected in the socket within a predetermined maximum time (such as

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) - 4

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1    300 milliseconds) will the power supply switch the power on.  (*Id.*)  Thus, if a child, for

2    example, inserted a needle into one side of the plug socket, the power would not be switched on.

3    (*Id.*)  Even if a child inserted a second needle into the second pole, no power would be switched

4    on, because the two pins would not be detected within the predetermined maximum time.  (*Id.*)

5           18.    Panasonic is a Delaware corporation headquartered at 26200 Enterprise Way,

6    Lake Forest, California 92630.  (Declaration of Susan M. Gerber ("Gerber Decl.") ¶ 3, attached

7    hereto as Ex. 2.)  Although headquartered in California, Panasonic's corporate office in Bothell,

8    Washington, handles many key business functions, including program management, global

9    repair services, certification, system installation engineering, quality processes and finance,

10   credit and customer care.  (*Id.* ¶ 4.)

11          19.    Panasonic is a subsidiary of Panasonic Corporation of North America, which is, in

12   turn, the principal North American subsidiary of Panasonic Corporation.  (Gerber Decl. Ex. C.)

13   Panasonic designs, engineers, sells, and installs in-flight entertainment and communications

14   solutions to airlines worldwide for both commercial and private aircraft.  (Gerber Decl. ¶ 5.)

15          20.    AES sells its 110 V, in-seat power systems to Panasonic, among other aircraft-

16   component companies, to be combined with Panasonic's in-flight entertainment units.  (Jaekel

17   Decl. ¶ 22.)  Many of these Panasonic units, which include the AES in-seat power systems, are

18   constructed pursuant to specifications from Airbus, for installation on Airbus's aircraft in

19   Europe.  (*Id.*)

20          21.    Many or most of these AES in-seat power systems are delivered to Panasonic's

21   facility in Bothell, Washington.  (*Id.* ¶ 23.) Accordingly, the documentation of and relating to the

22   sales of AES's in-seat power systems to Panasonic for installation in Airbus's aircraft in Europe

23   should be located at the Bothell, Washington, facility or otherwise in the custody and control of

24   Panasonic and its employees in the Bothell, Washington, facility.  (*Id.* ¶ 24.)

25

26

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) - 5

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1

## SECTION 1782 STATUTORY REQUIREMENTS HAVE BEEN MET

2      22.      Title 28 U.S.C. § 1782 authorizes this Court to order any person in the Western

3  District of Washington to give testimony or produce documents for use in a foreign proceeding

4  upon the application of any person with an interest in that proceeding.  Specifically, Section

5  1782(a) provides, in pertinent part:

6              The district court of the district in which a person resides or is found may

7              order him to give his testimony or statement or to produce a document or
               other thing for use in a proceeding in a foreign or international tribunal,

8              including criminal investigations conducted before formal accusation.  The
               order may be made . . . upon the application of any interested person and . . .

9              [t]o the extent that the order does not prescribe otherwise, the testimony or

10             statement shall be taken, and the document or other thing produced, in
               accordance with the Federal Rules of Civil Procedure.

11

12     23.      To obtain discovery in aid of a foreign litigation, a petitioner must show:  (a) that

13  the person to provide discovery resides or is found in the district where the application is made;

14  (b) that the information sought is "for use in a proceeding in a foreign or international tribunal";

15  and (c) that the petitioner is an "interested person" in the foreign proceeding.  28 U.S.C.

16  § 1782(a); *see also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246 (2004); *Pott*

17  *v. Icicle Seafoods, Inc.*, 945 F. Supp. 2d 1197, 1199 (W.D. Wash. 2013).  Lufthansa satisfies

18  each of these requirements.

19     24.      *First*, Panasonic resides in or can be found in this District.  Panasonic is a

20  Delaware corporation headquartered in California.  (Gerber Decl. ¶ 3.)  It maintains a corporate

21  office in Bothell, Washington, where many key business functions relating to Panasonic's in-

22  flight entertainment systems are handled.  (*Id*. ¶¶ 4-5.)  On information and belief, the documents

23  that Lufthansa seeks are either located in Washington, or within this Respondent's possession,

24  custody, or control, as those terms are defined in Federal Rule of Civil Procedure 34.

25     25.      *Second*, the information sought is highly relevant to, and will be used to assist

26  Lufthansa in the pending German Action and in contemplated parallel actions.  As such actions

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) - 6

constitute proceedings in foreign tribunals, the second requirement is met.  *See Intel*, 542 U.S. at 258.

26.     *Third*, this application is made by "interested persons."  28 U.S.C. § 1782(a). Lufthansa is the plaintiff in the pending German Action.  (*See* Jaekel Decl. ¶ 11.)  Lufthansa will also be the plaintiff if the contemplated actions are initiated in France, Spain, the United Kingdom, and/or Japan.  Parties to foreign litigation are "interested persons."  *See Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782[.]"); *Akebia Therapeutics, Inc. v. FibroGen, Inc.*, 793 F.3d 1108, 1110-11 (9th Cir. 2015) (holding that a party to the foreign proceedings has the requisite "reasonable interest" necessary for judicial assistance pursuant to Section 1782).

## THE COURT SHOULD EXERCISE ITS DISCRETION AND PERMIT LUFTHANSA TO OBTAIN THE REQUESTED DISCOVERY

27.     Once the three statutory factors are satisfied, the district court should determine, in its discretion, whether to order the requested discovery.  *See Intel*, 542 U.S. at 264.

28.     In *Intel*, the Supreme Court refused to adopt inflexible rules for determining when or to what extent discovery is permissible under Section 1782.  Instead, the Court "suggested" factors that the district court could consider in resolving that question.  *See id.* at 247 ("Whether such assistance is appropriate in this case is a question yet unresolved.  To guide the District Court on remand, we suggest considerations relevant to the disposition of that question.").

29.     The four factors suggested by the Supreme Court for consideration are: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding" such that the "foreign tribunal has jurisdiction over [it]"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the requests are "unduly intrusive or burdensome," and, if so, whether those requests can be

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1    "trimmed." *Intel*, 542 U.S. at 264-65; *see also United States v. Global Fishing, Inc.*, 634 F.3d

2    557, 563 (9th Cir. 2011) ("*Global Fishing*").

3         30.    In addition to these suggested factors, the Court should also consider the

4    overarching principles of Section 1782.  "Section 1782 is the product of congressional efforts,

5    over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for

6    use in foreign tribunals." *Intel*, 542 U.S. at 247.  While this legislation has undergone many

7    amendments, these amendments have steadily and consistently moved the legislation in the

8    singular direction of providing more, not less, discovery for use in more, not fewer, judicial and

9    quasi-judicial forums in connection with more, not fewer, types of proceedings. *See id.* at 248-

10   49.  Indeed, the Seventh Circuit has explained that "a party to litigation in a foreign country can

11   seek discovery relating to that litigation in a federal district court, and, in the discretion of that

12   court, can obtain as much discovery as it could if the lawsuit had been brought in that court

13   rather than abroad." *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 594 (7th Cir. 2011)

14   ("*Biomet*") (internal citations omitted).

15        31.    Section 1782 has two aims:  to provide "efficient assistance to participants in

16   international litigation" in our federal courts and to "encourag[e] foreign countries by example to

17   provide similar assistance to our courts.  *Intel*, 542 U.S. at 252; *see also Akebia,* 793 F.3d at

18   1110; *Global Fishing*, 634 F.3d at 563; *Malev Hungarian Airlines v. United Techs. Int'l Inc.*, 964

19   F.2d 97, 100 (2d Cir. 1992); *Marubeni Am. Corp. v. LBA Y.K.*, 335 F. App'x 95, 96 (2d Cir.

20   2009) (noting that the district court's discretion should be guided by the twin aims of the statute);

21   *Cryolife, Inc. v. Tenaxis Med., Inc.*, No. C08-05124 HRL, 2009 WL 88348, at *3 (N.D. Cal.

22   Jan. 13, 2009) (granting discovery requested for use in German court because it would be

23   consistent with the twin aims of the statute).

24        32.    To that end, Section 1782 has been described as a "one-way street" that grants

25   wide assistance to others, but demands nothing in return.  *Malev*, 964 F.2d at 101.  "Absent

26   specific directions to the contrary from a foreign forum, the statute's underlying policy should

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) - 8

generally prompt district courts to provide some form of discovery assistance." *Euromepa, S.A. v. R. Esmerian, Inc*., 51 F.3d 1095, 1102 (2d Cir. 1995); *see also London v. Does 1-4*, 279 F. App'x 513, 515 (9th Cir. 2008) (affirming district court decision to permit Section 1782 discovery because the petitioner showed the discovery would be useful to prove its case in the foreign court). Indeed, if a court fails to consider this backdrop in analyzing the discretionary *Intel* factors, it risks abusing its discretion. *See Malev*, 964 F.2d at 101-02.

33. Applying these factors and considering the overarching principles behind the statute, this Court should permit Lufthansa to obtain the requested discovery.

## Panasonic Is Not a Party

34. The first *Intel* factor considers whether a respondent is a participant in the foreign proceedings because when a respondent is party, "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264.

35. Panasonic is not a participant in the German Action. As the *Intel* Court explained, this fact demonstrates why Lufthansa needs Section 1782 aid. *Id*. ("nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid"). Indeed, this Court has held that the first *Intel* factor "necessarily favors" the petitioner where the respondent "is not a party to the foreign action." *Pott*, 945 F. Supp. 2d at 1200. In addition, Lufthansa will have no opportunity to seek discovery of the information sought by Petition in the pending German Action because that jurisdiction does not have a mechanism that Lufthansa may invoke to obtain any discovery, let alone third-party discovery. (Jaekel Decl. ¶ 27.) In fact, the German Civil Procedure Code ("ZPO") does not incorporate the concept of discovery as it is understood in U.S. Procedure. (*Id.* ¶ 29.)

36. There is a provision in the ZPO, Section 142, that permits a party to request that the other party or a third party be ordered to present a certain, specifically-identified document.

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) - 9

(*Id.* ¶ 28.)  But Lufthansa cannot use that provision to obtain the discovery it seeks for at least three reasons.  *First*, to invoke Section 142 ZPO, Lufthansa would be required to identify specifically the document(s) it seeks and justify the request by showing how those specific document(s) would be used to support a claim or defense in the lawsuit; a general request seeking discovery of the internal documents of the other party as evidence for the litigation, no matter how narrowly tailored, would not be sufficient.  (*Id.*)  If the information sought is uniquely within the knowledge and possession of the other party, these hurdles simply cannot be overcome.  (*Id.* ¶ 29.)  *Second*, even if Lufthansa could overcome these hurdles, there is no guarantee that Panasonic would produce the requested documents in the German Action.  If a party or nonparty chooses not to produce the requested documents pursuant to Section 142 ZPO, there is no mechanism by which the German court can compel production.  (*Id.* ¶ 31.)  Instead, the German court may simply consider that noncompliance in rendering its decision.  (*Id.*)  *Third*, because the documents Lufthansa seeks are located in the United States, they are outside the jurisdictional reach of the German court.  (*Id*. ¶ 30.)

37.     In a case seeking discovery for use in a Venezuelan court, the petitioner was faced with foreign procedural rules that were very similar to those described in Mr. Jaekel's declaration.  *See In re Servicio Pan Americano de Proteccion, C.A.*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004).  There, the court granted the petition because, *inter alia*, "the apparent limitations of Venezuelan discovery rules suggest that the exercise of jurisdiction by this Court may be necessary to provide Pan Americano with the documents it seeks."  (*Id.*)

38.     Moreover, even if a mechanism did exist under German law to obtain such discovery, Section 1782 does *not* require that Lufthansa invoke that mechanism or exhaust all possible alternatives before seeking discovery in this Court.  *See Intel*, 542 U.S. at 261; *In re O'Keeffe,* 646 F. App'x 263, 268 (3d Cir. 2016) ("We have never held that an applicant must seek discovery relief in the foreign forum first."); *In re Procter & Gamble Co.,* 334 F. Supp. 2d

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) -
10

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1   1112, 1115 (E.D. Wis. 2004) (rejecting as "inefficient and possibly ineffective" the argument

2   that petitioner should have to seek discovery from the foreign tribunal first).

3       39.     As to the Contemplated Foreign Actions, these proceedings have not yet been

4   filed and it is not clear whether Panasonic might be a party or would otherwise be subject to

5   producing discovery in those actions.  But, in all events, because "[d]iscovery in the federal court

6   system is far broader than in most (maybe all) foreign countries," *Biomet*, 633 F.3d at 594, it is

7   unlikely that Lufthansa will be able to obtain the discovery it seeks from Panasonic using foreign

8   discovery procedures in the Contemplated Foreign Proceedings.  And, indeed, it is much more

9   efficient to allow Lufthansa to obtain this discovery now for the German Action and possible use

10  later in Contemplated Foreign Proceedings.  *Procter & Gamble Co.*, 334 F. Supp. 2d at 1115.

11      40.     The first *Intel* factor thus weighs in favor of granting Lufthansa's Petition.

12                  **The German Court Will Be Receptive to the Discovery**

13      41.     The second *Intel* factor considers the nature of the foreign tribunal and its

14  receptiveness to the requested discovery.  German courts generally receive evidence without

15  regard to its origin, how it was obtained, or whether the obtaining was in line with the ZPO, as

16  long as it was not obtained in violation of the basic rights provided in the German constitution.

17  (Jaekel Decl. ¶¶ 26, 32–33.)  German legal literature agrees that German law does not preclude

18  using evidence obtained by U.S. discovery procedures in German proceedings.  (*Id*. ¶ 32.)

19      42.     Absent authoritative proof that a foreign tribunal would reject evidence obtained

20  with the aid of Section 1782, this factor weighs in favor of granting a Section 1782 petition.  *See*

21  *Minatec Fin. S.A.R.L. v. SI Grp. Inc.*, No. 1:08-CV-269 (LEK/RFT), 2008 WL 3884374, at *6-7

22  (N.D.N.Y. Aug. 18, 2008) (granting request for discovery upon finding absence of authoritative

23  declarations from Germany's judiciary, executive, or legislature addressing the use of evidence

24  obtained by Section 1782); *Cryolife*, 2009 WL 88348, at *3 (finding no evidence that the

25  German court would be unreceptive to assistance under Section 1782 and granting petition).

26

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) -
11

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

43. In fact, the absence of such authoritative proof should end the inquiry. *See Minatec*, 2008 WL 3884374, at *6 ("Although the effort to provide this Court with th[ese] various perspectives interpreting German law is laudatory, both parties should have known that both the Supreme Court and the Second Circuit have repeatedly denounced such a practice and that such endeavor may be meaningless."). In that event, a court should turn to "the statute's 'overarching interest in providing equitable and efficacious procedures for the benefit of tribunals and litigants involved in the litigation'" in deciding whether to allow the discovery. (*Id.* at *7.)

44. Federal courts examining this factor have routinely granted requests to obtain discovery in the United States for use in proceedings pending in Germany. *See, e.g.*, *Biomet*, 633 F.3d at 599 (granting request for discovery under Section 1782 for German trade secret case); *Heraeus Kulzer GmbH v. Esschem, Inc.*, 390 F. App'x 88, 93 (3d Cir. 2010) (vacating order quashing subpoena and remanding with instructions to grant discovery on an expedited basis); *Cryolife*, 2009 WL 88348, at *4 (noting that under Section 1782, one is not "obliged to establish a 'compelling need' for discovery . . . petitioner need only show that the information will be useful"); *Minatec*, 2008 WL 3884374, at *4 ("[I]t is far better to provide federal court assistance than none at all."); *In re Gemeinschaftspraxis Dr. Med. Schottdorf*, No. Civ. M19-88 (BSJ), 2006 WL 3844464, at *7 (S.D.N.Y. Dec. 29, 2006) (concluding that the applicant's attempt to acquire discovery it was unable to obtain in Germany was "not an 'impermissible' use of § 1782 because, in some respects, that is precisely the type of assistance that the statute was designed to afford"); *Procter & Gamble Co.*, 334 F. Supp. 2d at 1115 (granting discovery for use in five foreign proceedings, including one in Germany).

45. And, indeed, evidence obtained pursuant to Section 1782 has been decisive in German proceedings. *See In re Heraeus Kulzer GmbH*, No. 3:09-CV-530 RLM-MGG, 2017 WL 214322, at *1 (N.D. Ind. Jan. 18, 2017) (noting that the German court "relied on" documents obtained pursuant to Section 1782 in reaching its judgment); *see also In re Heraeus Kulzer*

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) -
12

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1    *GmbH*, No. 3:09-CV-530 RM, 2015 WL 5613156, at *1 (N.D. Ind. Sept. 22, 2015) (noting that

2    "the German judgment quotes extensively from the cited documents," all of which were

3    produced pursuant to a Section 1782 petition).

4       46. Moreover, for the Contemplated Foreign Proceedings, courts have granted

5    Section 1782 discovery assistance for cases pending in France, Spain, the United Kingdom, and

6    Japan.  *See, e.g., Euromepa*, 51 F.3d at 1102 (reversing district court's denial of Section 1782

7    discovery for use in France); *In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998) (vacating order

8    denying 1782 discovery that has been sought for use in Spain) *In re Catalyst Managerial Servs.*

9    *DMCC*, 680 F. App'x 37, 41 (2d Cir. 2017) (granting discovery for use in the United Kingdom);

10   *Akebia*, 793 F.3d 1112-13 (granting discovery for use in Japanese proceedings).

11      47. The second *Intel* factor thus weighs in favor of granting Lufthansa's Petition.

12   **The Request Does Not Conceal an Attempt<br>to Circumvent Foreign Proof-Gathering Restrictions**

13      48. The third *Intel* factor considers whether the foreign jurisdiction has proof-

14   gathering restrictions that might be improperly circumvented if the discovery request is granted.

15   Germany has no such proof-gathering restrictions.  *See Intel*, 542 U.S. at 264-65.  As noted

16   above, German courts generally admit the evidence offered by a party without regard to its

17   origin.  (Jaekel Decl. ¶ 32–33.)  In addition, the ZPO contemplates that petitions may be filed

18   abroad to seek evidence from foreign countries.  One of Germany's leading legal commentators

19   has specifically opined that a petition under Section 1782 is an appropriate vehicle for obtaining

20   evidence under the ZPO.  (*Id.* ¶ 32.)

21      49. Similarly, U.S. courts have authorized Section 1782 discovery assistance for cases

22   brought in France, Spain, the United Kingdom and Japan.  *Euromepa*, 51 F.3d at 1102; *Bayer*,

23   146 F.3d at 196; *Catalyst Managerial Servs.*, 680 F. App'x at 41; and *Akebia*, 793 F.3d at 1112-

24   13.

25      50. The third *Intel* factor thus weighs in favor of granting Lufthansa's Petition.

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) -
13

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

## The Discovery Requests Are Narrowly Tailored to Obtain Relevant Information

51.     Lufthansa has narrowly tailored its discovery requests in this petition.  Lufthansa seeks discovery from Panasonic to establish the distribution chain through which the accused products are offered for sale, sold and distributed, and to determine the volume of infringing units sold in Germany and the other countries where Lufthansa holds patent rights relating to the technology claimed in EP 145 Patent.  To that end, Lufthansa seeks the documents identified in the proposed subpoena attached hereto as Exhibit 3.

52.     While Lufthansa has made every effort to propound narrowly tailored discovery requests, if these requests are deemed to be overly broad, the proper course of action is to modify the subpoena, rather than quashing it outright:

> [R]ecently, we have made the point that although American-style discovery for one party may skew foreign litigation, "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright."

*Metallgesellschaft AG v. Hodapp*, 121 F.3d 77, 80 (2d Cir. 1997) (quoting *Euromepa,* 51 F.3d at 1101); *see also id.* at 78 ("We agree . . . that the district court abused its discretion in refusing discovery.").

53.     Similarly, the Seventh Circuit reversed the lower court's denial of Section 1782 discovery, finding that denying the petitioner's request outright was an abuse of discretion:

> The district court's second error was to turn down [petitioner's] discovery request flat, on the ground that compliance would be unduly burdensome to [respondent], without requiring [respondent] to negotiate with [petitioner] over cutting down the request to eliminate excessive burden and failing that to ask the district court to limit the scope of discovery . . . .  If [petitioner is] asking for too much, the district court can and should cut down its request, but not to nothing, as it did.  That was unreasonable, and therefore reversible.

*Biomet*, 633 F.3d at 597-98.  Lufthansa stands ready and willing to cooperate with Panasonic to try to resolve any concerns that Panasonic may have about the breadth of its discovery requests.

54.     The fourth *Intel* factor thus weighs in favor of granting Lufthansa's Petition.

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) -
14

**The Proposed Protective Order Protects Panasonic's Confidentiality**

55.     Panasonic may challenge production of the requested documents and testimony by alleging that its own information is highly confidential.  Such confidentiality concerns should not be an impediment to this Court's granting Lufthansa's Petition for at least two reasons.

56.     *First*, this Court may enter a Protective Order to ensure that confidential information will be provided only to Lufthansa's counsel who have submitted to this Court's jurisdiction and not to Lufthansa's employees.  (*See* proposed Protective Order, attached hereto as Exhibit 4.)  The proposed Protective Order also provides that before Lufthansa may use a document in the pending German Action, it must give notice of its intent to Panasonic's counsel five (5) business days in advance.  Panasonic's counsel will then have an opportunity to challenge that proposed use in this Court if it believes there is an undue risk of disclosure of the confidential information.  Through this procedure, this Court can evaluate the likelihood that disclosure might occur, and balance Lufthansa's need for the information against Panasonic's confidentiality concerns.  The Ninth Circuit has acknowledged that protective orders of this sort sufficiently "guard against disclosure" of confidential information.  *Akebia*, 793 F.3d at 1112.

57.     *Second*, challenges to Lufthansa's proposed use should be rare because the German court files are not publicly accessible and because Germany has mechanisms to protect the confidentiality of evidence presented in their courts.  (*See* Jaekel Decl. ¶¶ 34–35.)

58.     Thus, Panasonic's potential confidentiality concerns are no basis for denying this Petition.

## CONCLUSION

59.     This Court should exercise its discretion in favor of Lufthansa to effectuate the twin aims of 28 U.S.C. § 1782: (i) providing efficient means of assistance to participants in international litigation in our federal courts; and (ii) encouraging foreign countries by example to provide similar means of assistance to our courts.  *See Intel*, 542 U.S. at 252; *Metallgesellschaft*, 121 F.3d at 79.  Lufthansa asks this Court to consider its request promptly to ensure that

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) -
15

responsive discovery is obtained in sufficient time to be of use in the German Action, and, after Panasonic has had an opportunity to voice any objections, to allow discovery relevant to the issues generally identified in this application, including issuing and serving a subpoena in the form of Exhibit 3 annexed hereto, pursuant to Rules 26, 30, 34, and 45 of the Federal Rules of Civil Procedure, (i) enter an order compelling Panasonic to produce documents; (ii) enter a Protective Order in the form annexed hereto as Exhibit 4; and (iii) grant such other and further relief to Lufthansa as may be just and equitable.

DATED this 25th day of September, 2017.

BYRNES KELLER CROMWELL LLP


By /s/ Bradley S. Keller
    Bradley S. Keller, WSBA #10665
By /s/ Keith D. Petrak
    Keith D. Petrak, WSBA #19159
    1000 Second Avenue, 38th Floor
    Seattle, Washington 98104
    206-622-2000
    206-622-2522
    bkeller@byrneskeller.com
    kpetrak@byrneskeller.com

    Lawrence D. Rosenberg
    JONES DAY
    51 Louisiana Avenue, N.W.
    Washington, D.C.  20001-2113
    Phone:  (202) 879-3939
    Fax:  (202) 626-1700
    (pro hac vice application to be filed)

    Susan M. Gerber
    JONES DAY
    North Point, 901 Lakeside Avenue
    Cleveland, OH  44141
    Phone:  (216) 586-3939
    Fax:  (216) 579-0212
    (pro hac vice application to be filed)

    *Attorneys for Petitioner*
    *Lufthansa Technik AG*

APPLICATION FOR DISCOVERY IN AID OF FOREIGN LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) - 16

1

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2017, a copy of the foregoing APPLICATION FOR

DISCOVERY IN AID OF FOREIGN LITIGATION PURSUANT TO 28 U.S.C. § 1782 was filed with the

Court and will be served within one business day upon Panasonic by delivering a copy of the

foregoing by hand delivery on its registered agent as follows:

C T CORPORATION SYSTEM
711 Capitol Way South, Suite 204
Olympia, WA  98501-1267


/s/ Keith D. Petrak
Keith D. Petrak

***Attorney for Petitioner***
***Lufthansa Technik AG***

APPLICATION FOR DISCOVERY IN AID OF FOREIGN
LITIGATION PURSUANT TO 28 U.S.C. § 1782 (No. 2:17-cv-1453) -
17

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In the Matter of the Application of LUFTHANSA TECHNIK, Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery, Pursuant to the Federal Rules of Civil Procedure, of Respondent Panasonic Avionics Corporation for Use in Foreign Proceedings. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

No.

DECLARATION OF GERD JAEKEL

1.      My name is Gerd Jaekel.  I am and have been admitted to practice law in Germany since 1994.  I am registered and in good standing as attorney-at-law with the Munich Bar.  I joined Jones Day in September 2010.

2.      Unless otherwise stated, I have personal knowledge of all the facts stated herein and if called as a witness would testify consistent with these facts.

3.      Lufthansa is one of the leading manufacturers and independent providers of maintenance, repair, overhaul, and modification services in the civil aviation industry.  With tailored maintenance programs and state-of-the-art repair methods, Lufthansa ensures the unbroken reliability and availability of its customers' fleets.  Lufthansa is an international organization involved in maintenance, production, and development.

DECLARATION OF GERD JAEKEL - 1

4.      In the manufacture and marketing of its patented technology, Lufthansa works with its licensee formerly known as DaimlerChrysler Aerospace Airbus GmbH K.I.D. Systeme and now known as K.I.D. Systeme GmbH ("K.I.D.").

5.      K.I.D. manufactures the patented power supplies for use in aircraft cabins under license with Lufthansa, and Lufthansa receives a per-unit royalty from K.I.D. for those power supplies sold by K.I.D.

6.      Lufthansa is the owner of European Patent No. EP 881 145 B1 and its German Publication No. DE 598 10 238 (collectively, "EP 145 Patent").

7.      The EP 145 Patent, entitled "Electrical Power Supply Device," issued on November 26, 2003.  The patent claims technology that, as I understand it, for the first time enabled a standard household voltage supply to be provided in the cabin of an aircraft to supply electricity to passengers so they can use their laptops or electronic entertainment devices in flight.  Before the patented invention, aviation authorities took the view that placing a plug socket in the armrest of a passenger seat, for example, posed a safety risk because there was a risk that the passenger might inadvertently insert conductive material into the socket and receive an electric shock.  The risk was particularly acute for young travelers, who might insert a sharp object into the plug socket.

8.      The technology in the EP 145 Patent incorporates safety features to prevent the possibility of electrical shock.  In particular, the patented technology ensures that power is supplied to a plug socket only if both pins are inserted into the socket at or almost at the same time.  In short, only when two pins are detected in the socket within a predetermined maximum time (such as 300 milliseconds) will the power supply switch the power on.  Thus, if, for example, a child inserted a needle into only one side of the plug socket, the power would not be switched on.  Indeed, even if a child inserted a second needle into the second pole, no power would be switched on, because the two pins would not be detected within the predetermined maximum time.

DECLARATION OF GERD JAEKEL - 2

BYRNES ◆ KELLER ◆ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

9.      Astronics Advanced Electronic Systems ("AES") manufactures and sells power supplies for use in the passenger cabin to the airline industry under the trade name "EmPower."

10.     While AES offers various versions of "EmPower" having differences in shape, number of connectors, and maximum rated performance, all of the systems at issue of which I am aware feature infringing power outlet systems.  AES refers to the components of the infringing products as "Outlet Units," "ISPS" (In Seat Power Supply), or "SPM" (Seat Power Module).  AES claims to have redesigned this technology and began selling the redesigned system to at least some customers beginning in 2013.

11.     On December 29, 2010, Lufthansa initiated infringement proceedings (the "German Action") in the District Court in Mannheim, Germany (the "Mannheim Court"), to stop AES from infringing Lufthansa's EP 145 Patent.  A copy of the complaint is attached hereto as Exhibit A, and an English translation of the complaint is attached hereto as Exhibit B.

12.     By that civil action, Lufthansa sought an injunction to stop any further harm from AES's infringement and to obtain damages to compensate it for AES's past infringement.

13.     On June 20, 2011, AES served Lufthansa with a formal response to the complaint, dated June 17, 2011, giving Lufthansa notice of AES' defenses in the German Action.

14.     AES's response asserted a number of defenses.  AES disputed Lufthansa's infringement claims, arguing that many of the accused power supplies do not satisfy all of the claim limitations in EP 145 Patent.

15.     AES also asserted a defense based on the license granted by Lufthansa to K.I.D.

16.     German patent cases are typically bifurcated so that infringement issues and invalidity issues are decided by different courts.  Lufthansa's case was bifurcated in this manner. In particular, on June 17, 2011, AES initiated nullity proceedings challenging the validity of the EP 145 Patent in the Federal Patent Court.  The Mannheim Court retained jurisdiction over the infringement portion of the case.

DECLARATION OF GERD JAEKEL - 3

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

17.     On November 14, 2011, the Mannheim Court stayed the infringement action until the Federal Patent Court rendered a decision regarding AES's nullity arguments.

18.     On December 18, 2013, the Federal Patent Court decided mostly in Lufthansa's favor.  In particular, it held that a combination of the challenged claims regarding the EP 145 Patent was valid.  On November 9, 2016, AES withdrew its appeal at the Federal Supreme Court, so that the decision as to validity has now become final.

19.     On February 6, 2015, the Mannheim Court held that AES had infringed the EP 145 Patent and rejected AES's various infringement defenses.  On November 14, 2016, the Karlsruhe Higher Regional Court affirmed this decision and decided that a further appeal to the Federal Supreme Court should not be certified.  AES filed a petition seeking leave to appeal to the German Federal Supreme Court.  In less than 8% of such petitions, the Federal Supreme Court admits the case for further appeal.  AES's petition is currently pending.

20.     Now that AES's liability has been determined, Lufthansa is actively pursuing its claim for damages in the German Action.  Lufthansa filed a motion concerning the determination of the payable amount of damages, and the Mannheim Court granted AES a term for a response, which starts after formal service on AES in the United States.

21.     Panasonic Avionics Corporation ("Panasonic") designs, engineers, sells, and installs in-flight entertainment and communications solutions to airlines worldwide.

22.     AES sells its in-seat power systems to Panasonic, which are then combined with Panasonic's in-flight entertainment units.  Many of these Panasonic units, which include the AES in-seat power systems, are constructed pursuant to specifications from Airbus for installation on Airbus's aircraft in Europe.

23.     Many or most of these AES in-seat power systems are delivered to Panasonic's facility in Bothell, Washington where they are incorporated into Panasonic's an inflight entertainment system (IFE).  From there, the IFE systems are sent to Germany ("Indirect Deliveries").  In other cases, AES delivers the in-seat power systems directly to Germany

DECLARATION OF GERD JAEKEL - 4

BYRNES • KELLER • CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

("Direct Deliveries"), where they are incorporated into Panasonic's IFE system.  In that event, Panasonic in Bothell is a contracting party that delivers all other components of an IFE and should have records of every IFE component delivered to Germany by Panasonic or AES.

24.     For these reasons, I believe documents and other evidence related to the sales of AES's in-seat power systems to Panasonic for installation in Airbus's aircraft in Europe should be located at the Bothell, Washington facility or otherwise in the possession, custody and/or control of Panasonic and its employees in the Bothell, Washington facility.

25.     Lufthansa claims that AES's use of its patented technology caused it damage in the range of millions of euros with regard to Direct Deliveries from AES to Germany.  So far, Lufthansa has not obtained evidence about the scope of deliveries to Germany through Panasonic or directly from either AES or Panasonic. According to German case law, AES is liable for damages caused by either the Direct Deliveries or Indirect Deliveries to Germany whenever AES had knowledge of the destination of the respective products.  Discovery from Panasonic would be helpful in proving damages from both Direct and Indirect Deliveries to Germany in the German Action.

26.     Civil procedure in the German courts is governed by the German Code on Civil Procedure ("Zivilprozessordung" or "ZPO").  The ZPO does not prohibit the use of evidence obtained in ways other than those provided by German law or even in violation thereof.  Indeed, I am aware of several cases where German courts have either accepted or indicated a willingness to accept evidence produced from the United States or other countries.

27.     Nevertheless, while the ZPO does not prohibit the use of evidence obtained by other means, such as through discovery actions in the United States under Section 1782, the ZPO does not provide a formalized means to request and subsequently obtain information from the other party in the German proceeding.  There is no mechanism for pre-trial discovery in German civil practice.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

28.     Section 142 ZPO merely provides that a party may request that the other party or a third party be ordered to present a certain, specifically identified document.  This request, however, is limited to documents the party can specifically identify and is entitled to receive— *e.g.*, documents belonging to the party or documents (invoices, etc.) which would be requested in an action for accounting.

29.     There are no procedural means in a German patent infringement case to seek general discovery of the internal documents of the other party to be used as evidence in litigation.  Therefore, if information is uniquely within the knowledge and possession of the other party in a German proceeding, there is no mechanism to obtain it under German civil procedure rules.

30.     In addition, documents located in the United States are outside the jurisdictional reach of the German courts.  While Section 810 BGB (German Civil Code) provides that third parties may have to produce a certain document, this section is simply not applicable to documents located outside Germany.  Similarly, Section 809 BGB, which provides that certain items may be inspected, is applicable only for specifically identified items that are located in Germany.

31.     Finally, if a party or nonparty chooses not to produce documents requested from the German Court pursuant to Section 142 ZPO, the German court may consider the party's noncompliance in rendering its decision.  It cannot, however, compel production.  Indeed, there is no means for it to do so.

32.     As a general matter, the German legal literature holds that there are no objections against the use of evidence in German civil proceedings that was obtained by United States discovery procedures.  (*See* Eschenfelder, RIW 2006, p. 443; Eschenfelder, IPRax 2006, p. 89; Kraayvanger, RIW 2007, 177, p. 183).

33.     In general, civil courts admit evidence without regard to its origin, how it was obtained, or whether it was obtained in line with the ZPO.  The Higher Regional Court

Byrnes • Keller • Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

(Oberlandesgericht) Brandenburg ruled that the actual truth is more important than the correct handling of the ZPO (*see* NJW-RR 2001, 1727).

34.     Regarding the protection of the confidentiality of certain documents to be disclosed under the requested discovery and potentially used in the German Action, it is highly unlikely that the documents would be made accessible to anyone other than the court, the parties directly involved in the litigation, and the respective counsel.

35.     Documents submitted to the German court as evidence in civil litigation will become a part of the court file.  Court files are not publicly accessible.  Under the ZPO, the direct access to the court files is limited to the court and the parties of the litigation. Section 299 ZPO, the provision relating to the access of files, provides that third parties shall be granted the right to inspect the court files by the President of the court only if they are able to demonstrate that they have a legitimate interest.  A mere economic or social interest is not sufficient.  Rather, the applicant must be able to show that his interest pertains to the matter in suit—*e.g.*, if he needs to evaluate the files to decide whether to join in the litigation.  Significantly, it is not sufficient if the applicant merely desires to access the files to facilitate a suit that does not directly relate to the subject matter in the pending suit or for mere curiosity.

36.     If a request to access the court files is filed by a third party, the court will carefully examine the request.  Usually, the parties to the litigation will be heard on the request. The court will then balance the interest of the parties and decide whether to permit access.  The court also has the possibility to limit the access of the third party to certain parts of the files. In addition, both parties may request that the public shall be excluded from the hearing when confidential information is discussed (Section 172 No. 2 the German Courts Constitution Act - "Gerichtsverfassungsgesetz" or "GVG") and that respective content of the court docket shall be excluded from any later file inspection.

37.     Further, because Lufthansa is a party to the Section 1782 proceedings in the United States, it can obligate itself by the terms of a protective order, issued by the United States

DECLARATION OF GERD JAEKEL - 7

1  court, to refrain from seeking direct access to these records and to limit its access to any

2  allegedly confidential information provided by Panasonic to outside counsel's and outside

3  experts'/consultants' eyes only.

4      38.    A European Patent must be enforced in each designated state independently.  In

5  addition to Germany, Lufthansa's EP 145 Patent is in force in France, Spain, and the U.K.

6  Lufthansa also owns a patent similar in scope to the EP 145 Patent in Japan (Patent No. JP

7  38888704 B2).  Lufthansa has suspected the possibility that AES has shipped its infringing

8  product to these other countries as well.  Lufthansa has not been able to obtain all relevant

9  evidence of those potential sales, however, and, without such evidence, it cannot reasonably

10  bring infringement suits in those countries.

11      I declare under penalty of perjury under the laws of the United States of America that the

12  foregoing is true and correct.

13

14  Dated: ___Sept. 25___, 2017

15

16  _____

                Gerd Jaekel

17

18

19

20

21

22

23

24

25

26

DECLARATION OF GERD JAEKEL - 8

# EXHIBIT A

**MÜNCHEN**

ANSGAR C. REMPP, LL.M. [1,2,3,6]
THOMAS C. MAHLICH, LL.M. [2,3]
SANDRA-CHRISTIANE KAMPER [2]
DR. MARTIN KOCK [2,3]
DR. MARTIN WEBER [8,9,10]
ADRIANE U. STURM [2]
DR. CHRISTIAN PAUL [2,7]
IVO POSLUSCHNY [2,12]
FRIEDERIKE GÖBBELS [2,6]
GERD JAEKEL [2]
DR. OLAF BENNING [2]
MARTIN SCHULZ, LL.M. [2]

STEFANIE STÖHR [2]
DR. THOMAS BERG [2]
DR. CHRISTIAN FULDA [2]
DR. ULRICH MEHLER, LL.M. [2]
THOMAS RITTER, PH.D. [8,9,10]
STEFAN SCHNEIDER [2]
DR. CHRISTOPHER MADER, LL.M. [2,14]
DR. CARSTEN SCHULTE, LL.M. [2]
ANDREAS ZELLER [9]
DR. NIKLAS PIENING [8,9,10]
DR. HUMAN BEHFOROUZI [2]

**J O N E S   D A Y**

RECHTSANWÄLTE · ATTORNEYS-AT-LAW

PATENTANWÄLTE

PRINZREGENTENSTR. 11

80538 MÜNCHEN

BUNDESREPUBLIK DEUTSCHLAND

TELEFON: (49) 89-20 60 42-200

TELEFAX: (49) 89-20 60 42-293

WWW.JONESDAY.COM

29. Dezember 2010

**FRANKFURT AM MAIN**

JÜRGEN REEMERS, LL.M. [1,2,3]
DR. THOMAS JESTAEDT, LL.M. [2]
OLIVER PASSAVANT [2,3]
DR. CARSTEN GROMOTKE, LL.M. [2]
DR. ANDREAS EBERT-WEIDENFELLER [2]
DR. VOLKER KAMMEL [2]
DR. DOROTHÉE WEBER-BRULS [8,9,10]
DR. HOLGER NEUMANN, LL.M. [2]
DR. ANDREAS JÜRGENS [2]
ANDREAS KÖSTER-BÖCKENFÖRDE [2,4]
MY LINH VU-GREGOIRE [3,13]
DR. RALF EK, LL.M. [2,5,11]
DR. JOHANNES ZÖTTL [2]
SABINE FELIX [2]

Landgericht Mannheim
A 1, 1
68159 Mannheim

**K L A G E**

In Sachen

**Lufthansa Technik AG**, vertreten durch deren Vorstand, Weg beim Jäger 193, 22313 Hamburg

- Klägerin -

Prozessbevollmächtigte:    JONES DAY, Rechtsanwälte Gerd Jaekel, Dr. Christian Paul, Dr. Ulrich Mehler, Dr. Carsten Schulte, Annemarie Grabrucker, Thomas Mahlich, Prinzregentenstr. 11, 80538 München

mitwirkend:    JONES DAY, Patentanwälte Andreas Holzwarth-Rochford, Dr. Martin Weber, Thomas Ritter, Dr. Niklas Piening

**g e g e n**

**Astronics Advanced Electronic Systems (AES),** vertreten durch deren Präsidenten, 9845 Willows Road NE, Redmond, WA 98052, U.S.A.

- Beklagte -

COMMERZBANK MÜNCHEN · KONTO-NR. 660601600 · BLZ 700 400 41 · IBAN DE23 7004 0041 0660 6016 00 · BIC COBADEFFXXX · UST/VAT REG NO DE 112010330

[1]PARTNER-IN-CHARGE; [2]RECHTSANWALT; [3]ATTORNEY-AT-LAW; [4]STEUERBERATER; [5]FACHANWALT FÜR HANDELS- UND GESELLSCHAFTSRECHT; [6]FACHANWALT FÜR ARBEITSRECHT; [7]FACHANWALT FÜR GEWERBLICHEN RECHTSSCHUTZ; [8]PATENTANWALT; [9]EUROPEAN PATENT ATTORNEY; [10]EUROPEAN TRADEMARK & DESIGN ATTORNEY; [11]ADVOKAT (SWEDEN); [12]SOLICITOR (ENGLAND & WALES); [13]ADVOCAT (FRANCE); [14]RECHTSANWALT (ÖSTERREICH)

ATLANTA · BEIJING · BRUSSELS · CHICAGO · CLEVELAND · COLUMBUS · DALLAS · DUBAI · FRANKFURT · HONG KONG · HOUSTON
IRVINE · LONDON · LOS ANGELES · MADRID · MEXICO CITY · MILAN · MOSCOW · MUNICH · NEW DELHI · NEW YORK · PARIS
PITTSBURGH · SAN DIEGO · SAN FRANCISCO · SHANGHAI · SILICON VALLEY · SINGAPORE · SYDNEY · TAIPEH · TOKYO · WASHINGTON

M 05 10

JONES DAY

wegen: Patentverletzung

Streitwert: vorläufig geschätzt € 2.000.000

Namens und in Vollmacht der Klägerin erheben wir Klage und **beantragen**:

Die Beklagte wird verurteilt,

1.      es bei Meidung eines vom Gericht in jedem Fall der Zuwiderhandlung festzusetzen-
den Ordnungsgeldes, ersatzweise Ordnungshaft bis zu sechs Monaten oder Ordnungs-
haft zu unterlassen,

eine Spannungsversorgungseinrichtung zur Bereitstellung einer Versorgungs-
spannung für elektrische Geräte in einer Flugzeugkabine mit einer Steckdose,
an die ein Gerät mit einem Stecker anschließbar und auf die eine Versorgungs-
spannung aufschaltbar ist, anzubieten, in den Verkehr zu bringen oder zu den
genannten Zwecken einzuführen,

wobei die Steckdose einen Steckerdetektor aufweist, der die Anwesenheit ei-
nes in die Steckdose eingesteckten Steckers detektiert und ein entfernt von der
Steckdose angeordnetes Versorgungsgerät vorgesehen ist, das über eine Sig-
nalleitung und über eine Versorgungsleitung für die Versorgungsspannung mit
der Steckdose verbunden ist, wobei das Versorgungsgerät die Versorgungs-
spannung auf die Steckdose aufschaltet, wenn der Steckerdetektor die Anwe-
senheit des Steckers über die Signalleitung an das Versorgungsgerät meldet,
wobei der Steckerdetektor derart ausgebildet ist, dass er die Anwesenheit von
zwei Kontaktstiften des Steckers in der Steckdose detektiert und das Versor-
gungsgerät die Versorgungsspannung nur dann auf die Steckdose aufschaltet,
wenn die Anwesenheit von zwei Kontaktstiften des Steckers gleichzeitig de-
tektiert wird,

[Patentanspruch 1]

insbesondere wenn

das Versorgungsgerät die Versorgungsspannung nur dann aufschaltet, wenn zwischen der Detektion des ersten und des zweiten Kontaktstiftes des Streckers eine maximale Kontaktzeit nicht überschritten wird;

[Patentanspruch 2]

der Steckerdetektor mechanische Schalter aufweist, die durch die eingesteckten Kontaktstifte des Steckers betätigt werden;

[Patentanspruch 3]

und die Spannungsversorgungseinrichtung mehrere Versorgungsgeräte und eine zentrale Spannungsquelle aufweist, wobei die Spannungsquelle die Spannungsversorgung der Versorgungsgeräte bildet und durch ein Steuersignal abschaltbar ist;

[Patentanspruch 7]

2. der Klägerin für die Zeit ab dem 26. Dezember 2003 Auskunft zu erteilen über den Vertriebsweg der unter Ziff. 1. beschriebenen Produkte, insbesondere unter Angabe der Namen und Anschriften der gewerblichen Abnehmer oder Auftraggeber;

3. der Klägerin unter Vorlage eines einheitlichen geordneten Verzeichnisses darüber Rechnung zu legen, in welchem Umfang sie die unter Ziffer 1. bezeichneten Handlungen seit dem 26. Dezember 2003 begangen hat und zwar unter Angabe

    a. der Menge der erhaltenen oder bestellten Erzeugnisse und Teilerzeugnisse sowie der Namen und Anschriften der Hersteller, Lieferanten und anderer Vorbesitzer sowie der bezahlten Preise;

    b. der einzelnen Lieferungen, aufgeschlüsselt nach Lieferzeiten und Preisen und Typbezeichnungen sowie den Namen und Anschriften der Abnehmer oder Auftraggeber,

JONES DAY

c.  den einzelnen Angeboten, aufgeschlüsselt nach Angebotsmengen, -zeiten, -preisen und Typbezeichnungen sowie den Namen und Anschriften der Angebotsempfänger sowie der Flugzeugtypen und Fluggesellschaften, für die sie bestimmt waren,

d.  der betriebenen Werbung aufgeschlüsselt nach Werbeträgern, deren Auflagenhöhe, Verbreitungszeitraum und Verbreitungsgebiet,

e.  der nach einzelnen Kostenfaktoren aufgeschlüsselten Gestehungskosten und des erzielten Gewinns,

sowie zum Nachweis der Angaben zu a. und b. die entsprechenden Einkaufs- und Verkaufsbelege (Rechnungen, soweit nicht vorhanden Lieferscheine) in Kopie vorzulegen;

4.  die unter Ziff. 1. bezeichneten, seit dem 26. November 2003 in Verkehr gebrachten Erzeugnisse gegenüber den gewerblichen Abnehmern unter Hinweis auf den gerichtlich (Urteil des LG Düsseldorf vom <...>) festgestellten patentverletzenden Zustand der Sache mit der verbindlichen Zusage zurückzurufen, etwaige Entgelte zu erstatten sowie notwendige Verpackungs- und Transportkosten sowie mit der Rückgabe verbundene Zoll- und Lagerkosten zu übernehmen;

5.  Es wird festgestellt, dass die Beklagte verpflichtet ist, der Klägerin allen Schaden zu ersetzen, der durch die unter Ziffer 1. bezeichneten seit dem 26. Dezember 2003 begangenen Handlungen entstanden ist und noch entstehen wird.

**Begründung:**

Die Beklagte hat im Gebiet der Bundesrepublik Deutschland Spannungsversorgungseinrichtungen angeboten, in den Verkehr gebracht und zu den genannten Zwecken eingeführt, die in den Schutzbereich des Europäischen Patents EP 881 145 – deutsches Aktenzeichen DE 59810238 – eingreifen und damit das Patent in Deutschland verletzen. Die Beklagte lieferte entsprechende Spannungsversorgungseinrichtungen an deutsche Sitzhersteller wie die Recaro

JONES DAY

Aircraft Seating GmbH & Co. KG mit Sitz in 74523 Schwäbisch Hall, an deutsche Flugzeug-hersteller wie die Airbus Gruppe, wo entsprechende Einrichtungen im Werk Finkenwerder bei Hamburg unter anderem für die Flugzeugtypen A 31X, A 32X und A380 eingebaut wur-den, sowie an die Firma Panasonic, mit dem Zweck, dass diese ihrerseits die Sitzhersteller und die Flugzeughersteller in Deutschland belieferte. Mit sämtlichen Lieferungen verstieß die Beklagte gegen das Europäische Patent EP 881 145 B1.

## I.      Zu den Parteien

1.    Die Klägerin gehört als Tochtergesellschaft der Deutschen Lufthansa AG zur Luft-hansa Gruppe. Sie befasst sich unter anderem mit der Entwicklung, Herstellung, Re-paratur, Wartung und Überholung von Flugzeugkomponenten, insbesondere auch im Bereich Flugzeugelektrik. Die streitgegenständliche Technik wurde im Hause der Klägerin entwickelt und zum Patent angemeldet.

Bei der Herstellung und Vermarktung der Technik arbeitet die Klägerin mit einem Unternehmen der Airbus Gruppe, der Firma KID-Systeme GmbH zusammen. KID stellt die entsprechenden Systeme in Lizenz her und vermarktet sie auf Basis einer Li-zenz mit Stücklizenzgebühr. Nach dem Lizenzvertrag bleibt die Klägerin zur Gel-tendmachung von Unterlassungsansprüchen und von Schadenersatz jedenfalls in Hö-he der entgangenen Lizenzgebühren berechtigt.

2.    Die Beklagte ist ein in den USA ansässiges, zur Gruppe der Astronics Corporation gehörendes Unternehmen, das einen Schwerpunkt im Bereich der Herstellung und des Vertriebs von Stromversorgungsgeräten hat.

## II.      Das Klagpatent

1.    Die Klägerin ist Inhaberin des Europäischen Patents EP 881 145 mit dem Titel „Spannungsversorgungsvorrichtung" – im Folgenden als Klagpatent bezeichnet, wel-ches wir als

**Anlage K 1**

vorlegen. Das Patent ist in Kraft. Einen aktuellen Rollenauszug überreichen wir als

**Anlage K 2.**

Das Patent wurde am 22. Mai 1998 unter Inanspruchnahme einer Priorität vom 31. Mai 1997 angemeldet, seine Erteilung wurde am 26. November 2003 bekannt gemacht.

2.  Das Klagpatent stellt eine Technik zur Verfügung, die es erstmals ermöglichte, in der Kabine eines Flugzeuges eine haushaltsübliche Netzspannung zur Versorgung von elektrischen Geräten, wie beispielsweise Laptops oder Unterhaltungselektronik-Geräten bereitzustellen. Zuvor wurde dies aus Sicherheitsgründen abgelehnt. Die Luftfahrtbehörden waren der Auffassung, dass eine Steckdose, beispielsweise in der Armlehne eines Passagiersitzes angebracht, gerade bei längeren Flügen insbesondere für mitreisende Kinder nicht sicher sei, da diese mit einem spitzen Gegenstand die elektrische Phase der Steckdose berühren könnten. Die durch das Klagpatent beschriebene Technik verhindert, dass solche Manipulationen zu einem Stromschlag führen können, indem die erfindungsgemäße Spannungsversorgungseinrichtung verschiedene Sicherheitsmerkmale aufweist. Aufgrund dieser Sicherheitsmerkmale ist es nunmehr zulässig, entsprechende Steckdosen in Flugzeugen vorzusehen, so dass Passagiere, wie heute üblich, insbesondere auf Langstreckenflügen in den Genuss einer Bordnetzversorgung an ihrem Sitz kommen.

3.  Die patentierte Technik gewährleistet, dass eine Spannung nur dann auf der Steckdose liegt, wenn beide Pole der Steckdose gleichzeitig eingesteckt werden. Hierzu wird zum einen die Anwesenheit von zwei Kontaktstiften detektiert. Zum anderen wird die Spannung nur dann aufgeschaltet, wenn die Anwesenheit der zwei Kontaktstifte des Steckers gleichzeitig detektiert wird. Die Anwesenheit des Steckers wird über eine Signalleitung an das Versorgungsgerät gemeldet, welches die Versorgungsspannung aufschaltet. Sticht also ein Kind mit einer Nadel in die Steckdose, wird kein Strom aufgeschaltet, weil es nur einen Pol der Steckdose berühren würde. Selbst wenn das Kind anschließend noch eine zweite Nadel in den zweiten Pol stecken würde, bliebe

es dabei, weil nur das gleichzeitige Einstecken zweier Pole, wie sie an einem handels-
üblichen Stecker vorhanden sind, zum Aufschalten der Versorgungsspannung führt.

4.  Der im Patent als vorbekannt zitierte Stand der Technik, insbesondere die Entgegen-
    haltungen EP 498 056, veröffentlicht auch als DE 41 03 792

### - Anlage K 3 -

sowie die Entgegenhaltung FR 2653944

### - Anlage K 4 -

bieten diesen Sicherheitsstandard nicht. Die Entgegenhaltung gemäß Anlage K 3 be-
schreibt zwar einen Steckerdetektor, der über eine Signalleitung an die Versorgungs-
spannung angeschlossen ist, so dass die Versorgungsspannung nur dann auf die
Steckdose aufgeschaltet wird, wenn die Anwesenheit eines Steckers gemeldet wird.
Die genannte Entgegenhaltung bietet aber keine ausreichende Sicherheit, da dieser
Detektor relativ einfach „überlistet" werden kann. Die Entgegenhaltung nennt weder
die Überprüfung beider Pole, noch das gleichzeitige Detektieren dieser Pole des Ste-
ckers in der Steckdose als Kriterium für das Aufschalten der Versorgungsspannung.
Daher wurden die im vorbekannten Stand der Technik bekannten Einrichtungen aus
Sicherheitsgründen lediglich mit einer Gleichspannung von bis zu 30 Volt an der
Steckdose eingesetzt. Diese Spannung ist für den menschlichen Körper ungefährlich.

Eine derart niedrige Versorgungsspannung hat erhebliche Nachteile. Zum einen kann
nicht jedes elektrische Gerät mit einer derart niedrigen Gleichspannung betrieben
werden. Zum anderen waren spezielle Adapterkabel erforderlich, um entsprechende
Niederspannungsgeräte an der Bordsteckdose anzuschließen.

5.  In den Figuren 1 und 2 des Klagpatents ist ein entsprechender Flugzeugsitz mit einer
    solchen patentgemäßen Bordsteckdose dargestellt, wie er heute in den meisten Lang-
    streckenflugzeugen üblich ist. Die Beschaltung ist beispielsweise in Figur 3 gezeigt
    und in Spalte 5 Abschnitt [0024] ff. beschrieben. Der im rechten Teil des Bildes (Fig.
    3) mit Bezugsziffer 51 gezeigte Stecker kann in die patentgemäße Steckdose 22 ein-

geführt werden. Das Vorhandensein der beiden Kontaktstifte 53 und 54 des Steckers in den entsprechenden Stecklöchern 40 und 41 der Steckdose wird durch die Mikroschalter 45 und 46 überprüft. Nur wenn in beiden Stecklöchern ein Kontaktstift vorhanden ist, wird durch die beiden Versorgungsleitungen 20 über seitlich liegende Kontaktelemente 42 und 43 Netzspannung angelegt. Die Steuerung der Netzspannung erfolgt über eine Kontrolleinheit 60. Diese prüft über die Signalleitungen 18, welche an die Mikroschalter 45 und 46 angeschlossen sind, nicht nur das Vorhandensein der Kontaktstifte des Steckers, sondern auch, ob beide Stifte gleichzeitig eingesteckt werden. In der allgemeinen Beschreibung heißt es hierzu in Spalte 3 Abschnitt [0013]:

> „In einer bevorzugten Ausgestaltung schaltet das Versorgungsgerät die Versorgungsspannung nur dann auf die Steckdose auf, wenn zwischen der erstmaligen Detektion des ersten und des zweiten Kontaktstiftes eine maximale Kontaktzeit nicht überschritten wird. Es wird also geprüft, ob die beiden Kontaktstifte annähernd zum gleichen Zeitpunkt in die Steckdose hineingesteckt werden. Wenn eine zu große Zeitdifferenz zwischen dem Einstecken der zwei Kontaktstifte festgestellt wird, wird von einer Manipulation der Steckdose ausgegangen. In diesem Fall wird keine Versorgungsspannung auf die Steckdose aufgeschaltet, so dass eine Gefährdung einer Person ausgeschlossen ist.“

In Abschnitt [0044] wird beschrieben, wie bei einer bevorzugten Ausführungsform eine solche Steuerschaltung ausgebildet werden kann: Zwischen der erstmaligen Betätigung des einen Kontaktschalters und des anderen Kontaktschalters wird von der Steuer- und Kontrolleinheit 60 eine Kontaktzeit ermittelt. Nur wenn diese Kontaktzeit unterhalb des Maximalwertes liegt, so dass man also von einem gleichzeitigen Einführen der Kontaktstifte des Steckers ausgehen muss, wird eine entsprechende Freigabeinformation in der Steuer- und Kontrolleinheit 60 gespeichert. Diese Steuereinheit kann weitere sicherheitsrelevante Merkmale aufnehmen, auf die wir hier nicht näher eingehen wollen. Nur wenn sämtliche sicherheitsrelevanten Merkmale erfüllt sind, wird die Versorgungsspannung über die Leitungen 20 aufgeschaltet.

## III.   Der Schutzbereich des Klagepatents

Mit der Klage wird eine Verletzung der Ansprüche 1, 2, 3 und 7 geltend gemacht.

Die Darlegung der Patentverletzung erfolgt anhand der nachstehenden Merkmalsanalyse:

(1) Spannungsversorgungseinrichtung zur Bereitstellung einer Versorgungsspannung für elektrische Geräte in einer Flugzeugkabine,

(2) mit einer Steckdose,

   (a) an die das Gerät mit einem Stecker anschließbar und

   (b) auf die die Versorgungsspannung aufschaltbar ist,

(3) wobei die Steckdose einen Steckerdetektor aufweist, der die Anwesenheit eines in die Steckdose eingesteckten Steckers detektiert,

(4) bei einem entfernt von der Steckdose angeordnetes Versorgungsgerät vorgesehen ist,

   (a) das über eine Signalleitung und

   (b) über eine Versorgungsleitung für die Versorgungsspannung mit der Steckdose verbunden ist, und

(5) wobei das Versorgungsgerät die Versorgungsspannung auf die Steckdose aufschaltet, wenn der Steckerdetektor die Anwesenheit des Steckers über die Signalleitung an das Versorgungsgerät meldet,

   dadurch gekennzeichnet, dass

(6) der Steckerdetektor derart ausgebildet ist, dass er die Anwesenheit von zwei Kontaktstiften des Steckers in der Steckdose detektiert und

JONES DAY

(7) dass das Versorgungsgerät die Versorgungsspannung nur dann auf die Steckdose aufschaltet, wenn die Anwesenheit von zwei Kontaktstiften des Steckers gleichzeitig detektiert wird;

(8) das Versorgungsgerät die Versorgungsspannung nur dann aufschaltet, wenn zwischen der Detektion des ersten und des zweiten Kontaktstiftes des Steckers eine maximale Kontaktzeit nicht überschritten wird (Unteranspruch 2);

(9) der Steckerdetektor mechanische Schalter aufweist, die durch die eingesteckten Kontaktstifte des Steckers betätigt werden (Unteranspruch 3)

(10)   die Spannungsvorsorgungseinrichtung mehrere Versorgungsgeräte und eine zentrale Spannungsquelle besitzt, die die Spannungsversorgung der Versorgungsgeräte bildet, wobei die Spannungsquelle durch ein Steuersignal abschaltbar ist.

Diese Merkmalsanalyse legen wir der Einfachheit halber gesondert als

**Anlage K 5** (für das Gericht dreifach)

vor.

## IV.   Zur Technik der angegriffenen Ausführungsform

1.   Die angegriffene Ausführungsform ist unter der Bezeichnung „EmPower" in verschiedenen Variationen erhältlich, die sich – abgesehen von den nachfolgend erörterten Baureihen-Unterschieden – nur durch geringfügige Abweichungen, wie beispielsweise die äußerliche Gestaltung, Zahl der Anschlüsse und die maximal abgegebenen Leistung, auszeichnen. Diese Variationen sind für die Frage der Verletzung des Klagpatents unerheblich, so dass wir hier nicht weiter darauf eingehen. Die Beklagte unterscheidet zwischen „In-Seat Power Systems" und „Integrated Seat Power". Bei letzteren ist eine Schnittstelle für das Bordunterhaltungssystem („In Flight Entertain-

JONES DAY

ment – IFE) integriert, was hier nicht von Bedeutung ist. Die streitgegenständlichen Systeme besitzen jeweils passende Steckdosen - von der Beklagten „Outlet Units" genannt – und Steuergeräte (umfassend die Versorgungsgeräte und eine Spannungsquelle) an den Sitzen – von der Beklagten beispielsweise „ISPS (In Seat Power Supply) oder SPM (Seat Power Modul) genannt, die mit der Bordspannung gespeist werden. Wir legen im Folgenden beispielhaft Wartungsunterlagen für die Steckdosen und die Steuergeräte vor. Die Klage ist jedoch nicht auf diese Gerätekombinationen beschränkt, sondern betrifft sämtlich von der Beklagten für den deutschen Markt angebotenen und in Verkehr gebrachten Systeme die Netzspannungen im Passagierraum zur Verfügung stellen, da es keine für das Streitpatent technisch relevanten Unterschiede gibt.

Das Dokument 25-21-04 dient als Wartungsunterlage für ein SPM

**- Anlage K 6.**

Ferner legen wir als

**Anlage K 7**

eine Kurzbeschreibung des streitgegenständlichen „EmPower"-Systems der Beklagten vor. In diesem Dokument wird die generelle Eigenschaft des Systems kurz zusammengefasst. Es ist dort auch erwähnt, dass das System kompatibel mit Steckern aus über 145 Ländern ist und unter anderem beim Airbus A 380 eingebaut wird. Das angebotene System schaltet nur dann eine Netzspannung auf die Steckdose, wenn ein handelsüblicher Stecker ordnungsgemäß in die Steckdose eingeführt wurde. Hierzu heißt es:

> „Safety interlock provides power only when a plug has been properly inserted into the outlet when used with EmPower® power supplies."

Die Versorgungsspannung steht mit 110 Volt, 60 Hertz als Wechselspannung zur Verfügung, wie sich ebenfalls bereits aus dieser Kurzbeschreibung ergibt. Die Anleitung für das 400 Watt Modul (Anlage K 6) beschreibt auf Seite 14 und 15, dass Versor-

JONES DAY

gungsgerät im SPM die Wechselspannung zur Verfügung stellt, wenn eine ordnungs-
gemäße Verbindung detektiert wird. Hierzu wird erörtert, dass dies der Fall ist, wenn
beide Pole gleichzeitig eingesteckt werden. An der genannten Stelle heißt es:

> „Both pins of the PED-plug are detected in the outlet unit
> within 50 ms maximum of each other."

Die englische Abkürzung „PED" – Personal Electrical Device – bezeichnet das End-
gerät, an welches die Steckdose angeschlossen werden soll. Als „PED-plug" wird
dementsprechend der Stecker dieses Endgerätes bezeichnet. Wie in der Wartungsan-
leitung beschrieben, wird die Versorgungsspannung also nur dann aufgeschaltet,
wenn beide Pole des Steckers innerhalb von 50 ms in die Steckdose eingeführt wer-
den. Auf den Seiten 10 und 11 ist die Verdrahtung mit dem Versorgungsgerät be-
schrieben. Die Anschlüsse J 6 und J 7, die in Tafel 10 dargestellt sind, sind mit den
Pins 1, 8, 9 und 15 an die Versorgungsspannung angeschlossen. Die Zurverfü-
gungstellung der Versorgungsspannung unterliegt aber der Bedingung, dass das Ver-
sorgungsgerät die Versorgungsspannung freigibt. Hierzu existiert eine Datenleitung,
die über die Pins 2, 7, 10 und 14 angeschlossen wird.

2.    Wir legen außerdem das Modell eines solchen streitgegenständlichen Steckers als

**Anlage K 8** (nur für das Gericht)

vor. Außerdem führen wir als

**Anlage K 9**

Fotografien dieses Steckers in das Verfahren ein. Auf diesen Fotografien ist die
Steckdose mit und ohne eingestecktem Stecker zu erkennen.

Wichtig ist der am Ende der Stecklöcher vorgesehene Mikroschalter. Solange kein
Stecker in die Steckdose eingesteckt ist, die Kontaktstifte also nicht in die Stecklöcher
eingeschoben sind, ist dieser Mikroschalter geschlossen. Erst wenn der jeweilige Kon-
taktstift in dem Steckloch bis zum Ende eingesteckt ist, öffnet sich der Mikroschalter.
Der Mikroschalter selbst ist ebenfalls in einer der Fotografien abgebildet. Der Strom-

JONES DAY

kreis über die Signalleitung ist also geschlossen, solange kein Stecker eingesetzt wurde. Mit dem Einsetzen wird der Stromkreis über die Signalleitung unterbrochen und das Versorgungsgerät erhält mithin jeweils ein Steuersignal, welches angibt, dass der betreffende Stift in dem Steckloch eingesetzt ist. Die Signale beider Stecklöcher werden unabhängig voneinander an das Versorgungsgerät weitergegeben, so dass diese den Zeitraum, der zwischen dem Einsetzen der beiden Kontaktstifte liegt, messen kann. Entsprechend der Wartungsanleitung darf dieser Zeitraum 50 ms, das heißt eine 1/20stel Sekunde nicht überschreiten. Andernfalls geht das Gerät davon aus, dass die beiden Pole nicht gleichzeitig angesteckt wurden und sperrt die Versorgungsspannung.

3.      Das beispielhaft dargestellte SPM 1248 besitzt gemäß den Seiten 2003/2004 der Anlage K 6 zwei getrennte Schaltungsblöcke „Power CCA" und „Control CCA". In dem Block Power CCA wird die im Flugzeug zur Verfügung stehende Wechselspannung von 115V 360/800 Hz in eine Wechselspannung von 110V mit fester Frequenz 60Hz umgewandelt (vgl. auch Seite 1 der Anlage K 6). Diese Netzspannung wird dann zum Schaltungsblock Control CCA geführt und von dort in Abhängigkeit von den Sicherheitsmerkmalen wie oben beschrieben zur Verfügung gestellt. Die Versorgungsspannungen können zentral durch ein Steuersignal im Fall einer Fehlfunktion abgeschaltet werden (vgl. Seite 16 der Anlage K 6 („If a fault condition is present, the SPM enterst he Off state").

## V.      Zur Frage der Verletzung

1.      Wie anhand der vorgenannten Wartungsunterlagen erkennbar ist, liegt eine wortsinngemäße Verletzung der geltend gemachten Patentansprüche vor. Bereits das Prospektblatt gemäß Anlage 7 stellt die angegriffene Ausführungsform als eine Spannungsversorgungseinrichtung zur Bereitstellung einer Versorgungsspannung für elektrische Geräte in einer Flugzeugkabine dar, wobei eine Steckdose für handelsübliche

Stecker eines Gerätes vorhanden ist, auf die eine Versorgungsspannung aufschaltbar ist (Merkmale 1 und 2).

2.  Die Steckdose weist einen Steckerdetektor auf, der die Anwesenheit des eingesteckten Steckers detektiert (Merkmal 3).

3.  Es sind sowohl eine Versorgungsleitung als auch eine Signalleitung vorhanden, welche das Versorgungsgerät mit der Steckdose verbinden. Als Versorgungsgerät dient der Chip „Control CCA" des Steuergerätes (SPM). Das Versorgungsgerät ist also entfernt von der Steckdose angeordnet (Merkmal 4).

4.  Ebenfalls bereits aus der Kurzanleitung ersichtlich, wird Versorgungsspannung nur dann aufgeschaltet, wenn die Anwesenheit des Steckers über die Signalleitung an das Versorgungsgerät gemeldet wird und wenn die Anwesenheit von zwei Kontaktstiften des Steckers gleichzeitig detektiert wird (Merkmale 5, 6 und 7).

5.  Dabei darf eine maximale Kontaktzeit von 50 ms nicht überschritten werden (Merkmal 8).

6.  Anhand der Fotos ist erkennbar, dass es sich bei dem Steckerdetektor um mechanische Schalter handelt, die durch die eingesteckten Kontaktstifte des Steckers betätigt werden (Merkmal 9).

7.  Darüber hinaus sind auch die Merkmale des Anspruchs 7 verwirklicht. Das System ist so ausgelegt, die im Baustein Control CCA enthaltenen Versorgungsgeräte einer zentralen Spannungsquelle zugeordnet sind. Als Spannungsquelle versteht der Fachmann auch ein Bauteil, welches eine umgewandelte Wechselspannung zur Verfügung stellt. Der Schaltkreis „Power CCA" dient also als abschaltbare Spannungsquelle, die auf ein Steuersignal reagiert (Merkmal 10).

## VI.  Rechtliche Erwägungen

1.  Als Lizenzgeberin bleibt die Klägerin berechtigt, Ansprüche auf Unterlassung und Schadenersatz geltend zu machen. Der Schaden, der geltend gemacht wird, umfasst

JONES DAY

den bei ihr entstandenen Schaden, der durch die Verletzungshandlungen entstanden ist. Da sich die Lizenznehmerin der Klägerin und die Beklagte quasi den Markt teilen, muss man davon ausgehen, dass jedes System, welches nicht mit Teilen der Beklagten ausgerüstet wird, zwangsläufig über ein System der Lizenznehmerin KID der Klägerin hätte ausgerüstet werden können. Daher entstand ein erheblicher Ausfall von Lizenzeinnahmen auf Seiten der Klägerin.

2.      Das Gericht ist örtlich und sachlich zuständig, da Verletzungshandlungen unter anderem in Baden-Württemberg geltend gemacht werden. Insbesondere wurden an den Sitzhersteller Recaro, mit Sitz in Baden-Württemberg, Teile geliefert.

3.      Die Klägerin hat erst kürzlich davon erfahren, dass die Beklagte bereits seit geraumer Zeit die streitgegenständlichen Systeme herstellt und nach Deutschland liefert. Da die Klägerin außerdem davon Kenntnis erlangt hat, dass der Beklagten das streitgegenständliche Patent wohlbekannt ist und sie sich bewusst über dieses Patent hinweggesetzt hat, wurde von einer vorgerichtlichen Abmahnung abgesehen.

Die im Schriftsatz genannten Anlagen werden mit einem gesonderten Schriftsatz nachgereicht sobald sich ein deutscher Vertreter der Beklagten legitimiert. Wir bitte um internationale Zustellung der Klage ohne die hier in Aussicht gestellten Anlagen.

Gerd Jaekel
Rechtsanwalt

# EXHIBIT B

# JONES DAY

80538 MUNICH

29th December 2010

Mannheim Regional Court
A 1,1
68159 Mannheim

## STATEMENT OF CLAIM

In the matter of

**Lufthansa Technik AG**, represented by its Board of Directors, Weg beim Jäger 193, 22313 Hamburg

- Plaintiff -

| | |
|---|---|
| Counsel: | JONES DAY, Attorneys Gerd Jaekel, Dr. Christian Paul, Dr. Ulrich Mehler, Dr. Carsten Schulte, Annemarie Grabrucker, Thomas Mahlich, Prinzregentenstr. 11, 80539 Munich |
| Assistant Attorneys: | JONES DAY, Patent Attorneys Andreas Holzwarth-Rochford, Dr. Martin Weber, Thomas Ritter, Dr. Niklas Piening |

vs.

**Astronics Advanced Electronic Systems (AES)**, represented by its President, 9485 Willows Road NE, Redmond, WA 98052, U.S.A.

- Defendant -

in respect of: Infringement of patent

Value at issue:        provisionally estimated at € 2,000,000

In the name of and on behalf of the Plaintiff, we would now file an action and **apply as follows**:

The Defendant is to be ordered

1.     to refrain on pain of financial penalty to be imposed by the Court for each case of contravention or in the alternative a custodial sentence of up to six months from

offering for sale, marketing or bringing into use for the specified purposes a power supply system for supply of power for electrical equipment in an aircraft cabin with a socket to which a device with a plug may be connected and to which supply voltage may be connected,

where the socket has a plug detector which detects the presence of a plug inserted into the socket and a power supply unit is provided remotely from the socket which is connected via a signal line and via a supply line for the power supply to the socket and the power supply unit connects the supply voltage to the socket if the plug detector registers the presence of the plug via the signal line to the power supply unit, where the plug detector is so designed that it detects the presence of two contact pins of the plug in the socket and the power supply unit only connects the power supply to the socket if the presence of two contact pins is simultaneously detected,

[Patent Claim 1]

in particular where

the supply unit only connects the power supply if a maximum contact time between the detection or the first and the second contact pin of the plug is not exceeded;

[Patent Claim 2]

the plug detector is fitted with mechanical switches operated by the inserted contact pins of the plug

[Patent Claim 3]

and the power supply system has several supply units and a central power source where the power source forms the power supply of the supply units and can be switched off by means of a control signal

2

[Patent Claim 4]

2.      to furnish the Plaintiff with information as from 26th December 2003 regarding the sales channel for the products described under Point 1 above, including in particular the names and addresses of the commercial customers or clients;

3.      to account to the Plaintiff by presenting a uniformly ordered list as to the extent to which it has undertaken the actions described in Point 1 above since 26th December 2003 stating

   a.      the quantity of products and part-products received or ordered together with the names and addresses of the manufacturers, suppliers and other prior owners and the prices paid,

   b.      the individual deliveries, broken down according to delivery periods and prices and type designations and the names and addresses of the customers or clients,

   c.      the individual offers for sale, broken down according to offer quantities, periods, prices and type designations and the names and addresses of the recipients of such offers and the aircraft types and airline companies for which they were intended,

   d.      the advertising undertaken broken down according to advertising media, circulation figures, distribution period and distribution territory,

   e.      the production costs broken down according to individual cost factors and the profits achieved,

   together with copies of the corresponding purchase and sale vouchers (invoices or where not available delivery notes) as evidence for the above information;

4.      to recall the products described in Point 1 above marketed since 26th November 2003 [*sic - Tr.*] to commercial customers, making reference to the patent-infringing status of the product as established by court order (Düsseldorf Regional Court judgment of <...>) and including the binding commitment to refund any remuneration and to bear any necessary packaging and carriage costs and any customs and storage costs associated with their return;

5.      It is established that the Defendant is required to compensate the Plaintiff for all past and future damages arising as a result of the actions committed since 26th December 2003.

**Grounds:**

The Defendant has offered for sale, marketed and brought into use for the specified purposes in the Federal Republic of Germany power supply systems which impinge upon the protective scope of European Patent EP 881 145 - German File Number DE 59810238 - thereby infringing said patent in Germany. The Defendant has delivered corresponding power supply systems to German seat manufacturers such as Recaro Aircraft Seating GmbH & Co. KG with registered office in 74523 Schwäbisch Hall, to German aircraft manufacturers such as the Airbus Group, where corresponding systems have been installed at the works at Finkenwerder near Hamburg inter alia for the aircraft types A 31X, A 32X and A380, and to the company Panasonic with the aim of enabling the latter in turn to supply the seat manufacturers and aircraft manufacturers in Germany. All deliveries by the Defendant constituted an infringement of European Patent EP 881 145 B1.


I.      **Parties**

1.      The Plaintiff is a subsidiary of Deutsche Lufthansa AG within the Lufthansa Group. It is involved inter alia in the development, manufacture, repair, maintenance and servicing of aircraft components, including in particular in the area of aircraft electrical systems. The technology at issue was developed in the Plaintiff's company and a patent application made.

        In the manufacture and marketing of the technology, the Plaintiff works together with a company of the Airbus Group, the company KID-Systeme GmbH. KID produces the corresponding systems under licence and markets them on the basis of a licence with a per unit royalty. Under the licensing agreement, the Plaintiff has reserved the right to assert claims for injunctive relief and for damages of not less than the forfeited royalties.

2.      The Defendant is a company based in the USA and a member company of the Astronics Corporation operating primarily in the area of the manufacture and sale of power supply equipment.


II.     **Patent in suit**

1.      The Plaintiff is the owner of European Patent EP 881 145 entitled "Power Supply Device" - hereinafter referred to as the patent in suit, which we would now submit as

**Exhibit K 1.**

The patent remains in force. We would further submit as

4

## Exhibit K 2

a current extract from the Patent Register. The patent was applied for on 22nd May 1998 claiming a priority date of 31st May 1997. The grant of patent was announced on 26th November 2003.

2.  The patent in suit makes a technology available which for the first time enables a standard household voltage supply to be provided in the cabin of an aircraft for the supply of electrical equipment such as laptops or entertainment electronics. This had previously been rejected on safety grounds. The aviation authorities had taken the view that a plug socket, for instance installed in the armrest of a passenger seat, was unsafe particularly on long-haul flights and specifically for travelling children, as the latter might be able to come into contact with the electrical phase of the plug socket using a sharp object. The technology described by the patent in suit prevents such manipulation from resulting in an electric shock in that the power supply system in accordance with the invention possesses various safety features. In view of these safety features, it is now permitted to provide corresponding sockets in aircraft, thus allowing in particular long-haul passengers to be able to enjoy an onboard power supply at their seat, as is nowadays customary.

3.  The patented technology ensures that power is only supplied to a plug socket if both poles of the socket are inserted simultaneously. To that end, on the one hand the presence of two contact pins is detected and on the other hand the power is only switched through if the presence of the two contact pins of the plug is detected simultaneously. The presence of the plug is registered via a signal line to the supply unit, which switches on the power supply. Thus, if a child inserts a needle into the socket, no power is switched on, as this would only contact one pole of the socket. Even if the child subsequently inserts a second needle into the second pole, the situation remains the same, as only the simultaneous insertion of two poles, such as those on a standard plug, results in the power supply being switched on.

4.  The state of the art referred to as prior knowledge in the patent, in particular the citations EP 498 056, also published as DE 41 03 792

### - Exhibit K 3 -

and the citation FR 2653944

### - Exhibit K 4 -

do not offer this standard of safety. Although the citation in Exhibit K 3 describes a plug socket which is connected via a signal line to the power supply so that the power supply is only switched through to the plug socket if the presence of a plug

5

is detected, the aforementioned citation does not offer adequate security, as this detector can be readily "tricked". The citation specifies neither the check of both poles, nor the simultaneous detection of those poles of the plug in the socket as a criterion for the switching on of the power supply. The devices known in the prior state of the art were therefore only used with a DC voltage of up to 30 volts at the socket for safety reasons, this level of voltage being unharmful for humans.

Such a low voltage has considerable disadvantages. On the one hand, not all electrical devices can be operated with such low DC voltage and on the other hand special adaptors were required in order to be able to connect corresponding low-voltage devices to the onboard plug socket.

5.  Figs. 1 and 2 of the patent in suit show a corresponding aircraft seat with such onboard plug socket in accordance with the patent such as is nowadays customary on most long-haul aircraft. The circuitry is shown by way of example in Fig. 3 and described in Column 5 Paragraph [0024] et seq. The plug shown on the right-hand side of the diagram (Fig. 3) with reference number 51 can be inserted into the patented socket 22. The presence of the two contact pins 53 and 54 of the plug in the corresponding socket apertures 40 and 41 is checked by the microswitches 45 and 46. Only if a contact pin is present in both insertion apertures is voltage applied through the two power supply lines 20 via laterally aligned contact elements 42 and 43. The power supply is controlled by a control unit 60, which checks via the signal lines 18 connected to the microswitches 45 and 46 not only the presence of the contact pins of the plug, but also whether both pins are inserted simultaneously. In the general description, this is described as follows in Column 3 Paragraph [0013]:

> "In a preferred embodiment the power supply unit only connects the supply voltage to the socket if a maximum contact time between the initial detection of the first and second contact pin is not exceeded. It is thus checked whether both contact pins are inserted into the socket at approximately the same time. If an excessively great time difference between the insertion of the two contact pins is detected, it is assumed that a manipulation of the socket has occurred. In that event, no supply voltage is connected to the socket, thus precluding any risk to personal safety.

Paragraph [0044] describes how such control circuit can be designed in a preferred embodiment: A contact time is determined by the control unit 60 between the initial actuation of the one contact switch and the other contact switch. Only if this contact time is below the maximum value and it must therefore be assumed that the contact pins of the plug have been inserted simultaneously is corresponding enabling information stored in the control unit 60. This control unit can store further safety features, which we shall not examine here. The supply voltage is only connected via the lines 20 if all safety features have been met.

### III.   Protective scope of patent in suit

The present action claims an infringement of Claims 1, 2, 3 and 7.

The infringement is demonstrated on the basis of the following analysis of characteristics:

(1)   Power supply system for supply of power for electrical equipment in an aircraft cabin

(2)    with a socket

      (a)   to which a device with a plug may be connected and

      (b)   to which supply voltage may be connected,

(3)   where the socket has a plug detector which detects the presence of a plug inserted into the socket,

(4)   a power supply unit is provided remotely from the socket

      (a)   which is connected via a signal line and

      (b)   via a supply line for the power supply to the socket and

(5)   the power supply unit connects the supply voltage to the socket if the plug detector registers the presence of the plug via the signal line to the power supply unit,

characterised in that

(6)   the plug detector is so designed that it detects the presence of two contact pins of the plug in the socket and

(7)   the power supply unit only connects the power supply to the socket if the presence of two contact pins is simultaneously detected;

(8)   the supply unit only connects the power supply if a maximum contact time between the detection or the first and the second contact pin of the plug is not exceeded (sub-claim 2);

(9)   the plug detector is fitted with mechanical switches operated by the inserted contact pins of the plug (sub-claim 3)

7

(10)   the power supply system has several supply units and a central power source where the power source forms the power supply of the supply units and can be switched off by means of a control signal

In the interests of simplicity we would now submit this analysis of characteristics separately as

**Exhibit K 5** (in triplicate for the Court).

## IV.   Technology of opposed embodiment

1.   The opposed embodiment is available under the name "EmPower" in various versions, which apart from the series variations described below present only minor differences, such as the external shape, number of connections and maximum rated performance. These differences are irrelevant for the issue of the infringement of the patent in suit and are therefore not addressed here. The Defendant distinguishes between "In-Seat Power Systems" and "Integrated Seat Power", the latter incorporating an interface for the "In Flight Entertainment" (IFE) system, which is not relevant here. The systems at issue all feature appropriate sockets – referred to by the Defendant as "Outlet Units" – and control units (comprising the supply units and a voltage source) in the seats – referred to by the Defendant e.g. as "ISPS" (In Seat Power Supply) or "SPM" (Seat Power Module), which are powered by the onboard voltage circuit. We would now submit by way of example maintenance documentation for the sockets and the control units. However, the present action is not restricted to these combinations of devices, but concerns all systems offered for sale and marketed by the Defendant on the German market which provide power supplies in the aircraft cabin, as there are no differences of technical relevance for the patent in suit.

Document 25-21-04 is a maintenance document for an SPM

**- Exhibit K 6**.

We would further submit as

**Exhibit K 7**

a brief description of the Defendant's "EmPower" system at issue here. This document provides a brief summary of the general properties of the system. It is also stated therein that the system is compatible with plugs from over 145 countries and is fitted inter alia in the Airbus A 380. The system as offered only connects power to the socket if a standard commercial plug is properly inserted into the socket. It is stated in this regard:

8

> "Safety interlock provides power only when a plug has been properly inserted into the outlet when used with EmPower® power supplies."

The power is supplied as AC voltage at 110 volts, 60 hertz, as is also stated in this brief description. The manual for the 400 watt module (Exhibit K 6) states on Pages 14 and 15 that the supply unit in the SPM supplies the AC voltage if a proper connection is detected. It is explained that this is the case if both poles are inserted simultaneously, viz.:

> "Both pins of the PED-plug are detected in the outlet unit within 50 ms maximum of each other."

The abbreviation "PED" – Personal Electronic Device – refers to the terminal device to which the socket is to be connected. The plug of this terminal device is accordingly referred to as a "PED-plug". As described in the maintenance manual, the power supply is thus only connected if both poles of the plug are inserted into the socket within 50 ms. The wiring to the supply unit is described on Pages 10 and 11. The connectors J 6 and J 7 shown in Fig. 10 are connected to the power supply via Pins 1, 8, 9 and 15. However, the availability of the supply voltage depends on the supply unit enabling the supply voltage, for which a data line exists connected via Pins 2, 7, 10 and 14.

2.    We would further submit an example of such plug at issue here as

**Exhibit K 8** (for Court use only)

and photographs of this plug as

**Exhibit K 9.**

In the photographs, the socket is shown with and without inserted plug.

An important feature is the microswitch at the end of the insertion apertures. As long as no plug is inserted into the socket, i.e. the contact pins are not pushed into the insertion apertures, this microswitch is closed. The microswitch only opens when the contact pin is inserted up to the end of the insertion aperture. The microswitch itself is also shown in the photographs. The circuit via the signal line is thus closed so long as no plug is inserted. On insertion, the circuit is broken via the signal line and the supply unit consequently receives a control signal confirming that the relevant pin has been inserted into the aperture. The signals for both apertures are transmitted independently to the supply unit to enable it to measure the time between the insertion of both contact pins. According to the maintenance manual, this period must not exceed 50 ms, i.e. $1/20^{th}$ of a second, otherwise the device assumes that both poles were not inserted simultaneously and blocks the power supply.

3.    The SPM 1248 shown by way of example on Pages 2003/2004 of Exhibit K 6 has two separate circuit blocks "Power CCA" and "Control CCA", In the block Power CCA, the aircraft's onboard AC voltage of 115V 360/800 Hz is converted into an AC voltage of 110V with a fixed frequency of 60 Hz (cf. also Page 1 of Exhibit K 6). This supply voltage is then fed to the circuit block Control CCA and from there made available depending on the safety features as described above. In the event of a malfunction, the power supplies can be switched off by a control signal (cf. Page 16 of Exhibit K 6 "If a fault condition is present, the SPM enters the Off state").

## V.    Infringement

1.    As may be seen from the aforementioned maintenance documentation, there has been a literal infringement of the asserted patent claims. The leaflet submitted as Exhibit K 7 presents the opposed embodiment as a power supply unit designed to provide power for electrical equipment in an aircraft cabin, where a socket is provided for the standard commercial plugs of a device to which a power supply can be connected (Characteristics 1 and 2).

2.    The socket is equipped with a plug detector which detects the presence of the inserted plug (Characteristic 3).

3.    Both a supply line and a signal line are provided which connect the supply unit to the socket. The supply unit is the chip "Control CCS" of the control unit (SPM). The supply unit is thus arranged remotely from the socket (Characteristic 4).

4.    It is also apparent from the short manual that the power supply is only connected if the presence of the plug is registered via the signal line to the supply unit and if the presence of the two contact pins of the plug is detected simultaneously (Characteristics 5, 6 and 7).

5.    The maximum contact time of 50 ms must not be exceeded (Characteristic 8).

6.    It is apparent from the photographs that the plug detector comprises mechanical switches which are actuated by the inserted contact pins of the plug (Characteristic 9).

7.    In addition, the characteristics of Claim 7 have been implemented. The system is designed such that the supply units contained in the component Control CCA are allocated to a central power source. An expert also regards a power source as a component which makes converted AV voltage available. The circuit "Power CCA" thus serves as an interruptible power source which reacts to a control signal (Characteristic 10).

## VI.    Legal considerations

1.    As licensor, the Plaintiff is entitled to bring claims for injunctive relief and damages. The damages claimed comprise the losses suffered by the Plaintiff as a result of the infringing acts. As the Plaintiff's licensee and the Defendant in effect share the market between them, it must be assumed that any system which is not fitted with the parts produced by the Defendant could necessarily have been fitted with a system of the Plaintiff's licensee KID. The Plaintiff has thus suffered a considerable loss of royalty income.

2.    The Court has jurisdiction in terms of both venue and subject matter, as claims have been brought of infringing acts inter alia in Baden-Württemberg. In particular, parts have been supplied to the seat manufacturer Recaro based in Baden-Württemberg.

3.    The Plaintiff has only recently learned that the Defendant has been manufacturing the systems at issue and supplying them to Germany for some considerable time. Since the Plaintiff has also been made aware that the Defendant is fully cognisant of the patent in suit and has consciously ignored said patent, no warning notice has been sent prior to action.

The exhibits referred to in the present submission will be presented subsequently in a separate submission once a German legal representative of the Defendant has been confirmed. We would request that international service of the Statement of Claim be effected without the exhibits to be submitted subsequently.


[signed]

Gerd Jaekel
Attorney

11

# EXHIBIT 2

1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

10

11

12

13

14

15

16

| | |
|---|---|
| In the Matter of the Application of LUFTHANSA TECHNIK, Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery, Pursuant to the Federal Rules of Civil Procedure, of Respondent Panasonic Avionics Corporation for Use in Foreign Proceedings. | ) ) ) ) ) ) ) ) ) ) ) ) No. DECLARATION OF SUSAN M. GERBER |

17        I, Susan M. Gerber, declare as follows:

18        1.        I am counsel at the law firm of Jones Day.  I am an attorney duly authorized and

19 licensed to practice before the bars of the state of Ohio and of the United States District Court for

20 the Northern District of Ohio.

21        2.        Unless otherwise stated, I have personal knowledge of all the facts stated herein,

22 and if called as a witness I would testify consistent with these facts.

23        3.        According to the California Secretary of State, Panasonic Avionics Corporation is

24 a Delaware corporation headquartered at 26200 Enterprise Way, Lake Forest, California 92630.

25 A true and correct copy of the records from the California Secretary of State is attached hereto as

26 Exhibit A.

DECLARATION OF SUSAN M. GERBER - 1

4.      Panasonic has a corporate office in Bothell, Washington.  *See* https://www.panasonic.aero/contact-us/corporate-office/, last visited Sept. 22, 2017.  According to Panasonic's website and Wikipedia, Panasonic's office in Bothell, Washington, handles many key business functions, including program management, global repair services, certification, system installation engineering, quality processes and finance, credit and customer care.  A true and correct copy of the page from Wikipedia is attached hereto as Exhibit B.

5.      According to LEXIS database records, Panasonic designs, engineers, sells, and installs in-flight entertainment and communications solutions to airlines worldwide for both commercial and private aircraft.  A true and correct copy of the LEXIS database report is attached hereto as Exhibit C.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  September 25, 2017

Susan M. Gerber
Susan M. Gerber

DECLARATION OF SUSAN M. GERBER - 2

# EXHIBIT A

**Alex Padilla**
**California Secretary of State**

 Business Search - Entity Detail

The California Business Search is updated daily and reflects work processed through Wednesday, September 20, 2017. Please refer to document **Processing Times** for the received dates of filings currently being processed. The data provided is not a complete or certified record of an entity. Not all images are available online.

C1670543   PANASONIC AVIONICS CORPORATION

| | |
|---|---|
| Registration Date: | 08/13/1990 |
| Jurisdiction: | DELAWARE |
| Entity Type: | FOREIGN STOCK |
| Status: | ACTIVE |
| Agent for Service of Process: | C T CORPORATION SYSTEM |
| | 818 W 7TH ST STE 930 |
| | LOS ANGELES CA 90017 |
| Entity Address: | 26200 ENTERPRISE WAY |
| | LAKE FOREST CA 92630 |
| Entity Mailing Address: | 26200 ENTERPRISE WAY |
| | LAKE FOREST CA 92630 |

A Statement of Information is due EVERY year beginning five months before and through the end of August.

| Document Type ⬍ | File Date ⬇ | PDF |
|---|---|---|
| SI-COMPLETE | 08/08/2017 | |
| SI-COMPLETE | 08/10/2015 | |
| AMENDED REGISTRATION | 04/06/2005 | Image unavailable. Please request paper copy. |
| AMENDED REGISTRATION | 03/09/1995 | Image unavailable. Please request paper copy. |
| REGISTRATION | 08/13/1990 | Image unavailable. Please request paper copy. |

* Indicates the information is not contained in the California Secretary of State's database.

- If the status of the corporation is "Surrender," the agent for service of process is automatically revoked. Please refer to California Corporations Code **section 2114** for information relating to service upon corporations that have surrendered.
- For information on checking or reserving a name, refer to **Name Availability**.
- If the image is not available online, for information on ordering a copy refer to **Information Requests**.
- For information on ordering certificates, status reports, certified copies of documents and copies of documents not currently available in the Business Search or to request a more extensive search for records, refer to **Information Requests**.
- For help with searching an entity name, refer to **Search Tips**.
- For descriptions of the various fields and status types, refer to **Frequently Asked Questions**.

| Modify Search | New Search | Back to Search Results |
|---|---|---|



# State of California
## Secretary of State

### Statement of Information
**(Foreign Corporation)**
**FEES (Filing and Disclosure): $25.00.**
**If this is an amendment, see instructions.**
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

| F |
|---|

1. **CORPORATE NAME**

2. **CALIFORNIA CORPORATE NUMBER**

This Space for Filing Use Only

**No Change Statement**  (Not applicable if agent address of record is a P.O. Box address.  See instructions.)

3. **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**

☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 13.**

**Complete Addresses for the Following**  (Do not abbreviate the name of the city.  Items 4 and 5 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 4.   STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | |
| 5.   STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | |
| 6.   MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 4 | | | |

**Names and Complete Addresses of the Following Officers**  (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7.   CHIEF EXECUTIVE OFFICER/ | | | | |
| 8.   SECRETARY | | | | |
| 9.   CHIEF FINANCIAL OFFICER/ | | | | |

**Agent for Service of Process**  If the agent is an individual, the agent must reside in California and Item 11 must be completed with a California street address, a P.O. Box address is not acceptable.  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 11 must be left blank.

10. NAME OF AGENT FOR SERVICE OF PROCESS

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 11.   STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** | | | |

**Type of Business**

12. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

13.   THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |
|---|---|---|---|

SI-350 (REV 01/2013)                                                                                    APPROVED BY SECRETARY OF STATE

# EXHIBIT B

# Panasonic Avionics Corporation

From Wikipedia, the free encyclopedia

**Panasonic Avionics Corporation** (**PAC**) designs, engineers, manufactures, sells and installs customized in-flight entertainment and communications solutions to airlines worldwide. Panasonic Avionics Corporation is a subsidiary of Panasonic Corporation of North America, the principal North American subsidiary of Panasonic Corporation. Panasonic Avionics Corporation is headquartered in Lake Forest, California and has major business functions in Bothell, WA. Panasonic Avionics Corporation traces its roots to Matsushita Avionics Systems Corporation, founded in 1979.



The headquarters of Panasonic Avionics Corporation in California

## Contents

- 1 Clients
- 2 Operations
- 3 Controversy
- 4 See also
- 5 References
- 6 External links

## Clients

PAC is a supplier of in-flight entertainment equipment, including music, video on demand (movies and television shows), in-flight shopping, phone service, email, video games, and GPS flight location display. PAC is an approved supplier to Boeing, Airbus and Bombardier, and is the primary entertainment provider for a number of airlines worldwide. Competitors in the IFE market include Thales Group, Rockwell Collins, Zodiac In-Flight Innovations and LiveTV.

In late 2009, Lufthansa announced that starting mid-2010 they will re-launch their 'FlyNet' service with Panasonic Avionics' satellite-based broadband technology offering passengers in-flight Internet and cellphone connections. Lufthansa will make use of their existing onboard hardware that had been installed in 2003 by Connexion by Boeing, the now defunct provider of the airline's previous onboard connectivity system.[1][2]

## Operations

The product engineering and development departments are located in Lake Forest, CA; program management, certification, system installation engineering and quality are located in Bothell, Washington, and manufacturing is performed in Osaka, Japan. Other offices and repair facilities are located worldwide, with major offices in Toulouse, Hamburg, London, Dallas, Dubai and Singapore.

Panasonic Avionics Corporation is AS9100, ISO 14001, and ISO 27000 certified.

# Controversy

In March 2013, it was reported that American authorities were investigating the subsidiary for bribery. In February 2017, Panasonic said that PAC was being investigated by the DOJ and the SEC under the FCPA.[3]

# See also

- AeroMobile
- Aircell
- Row 44
- FlyNet

# References

1. Lufthansa to Launch In-flight Web, Phone System (http://www.usatoday.com/travel/flights/2009-10-12-lufthansa-in-flight-phone-interenet_N.htm) USA Today (12 October 2009)
2. Lake Forest's Panasonic Avionics Equips Lufthansa (http://www.ocmetro.com/t-Panasonic_equips_Lufthansa_10_12_09.aspx) OC Metro Magazine (12 October 2009)
3. "Panasonic says its avionics business being probed by U.S. authorities" (https://www.reuters.com/article/us-panasonic-probe-idUSKBN15H0OH). Reuters. 2 February 2017. Retrieved 2 February 2017.

# External links

- Panasonic Avionics Corporation official website (http://www.panasonic.aero)

Retrieved from "https://en.wikipedia.org/w/index.php?title=Panasonic_Avionics_Corporation&oldid=788669966"

---

- This page was last edited on 2 July 2017, at 19:57.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# EXHIBIT C

# *PANASONIC AVIONICS CORPORATION; Hoover's Company Records - In-depth Records*

September 20, 2017

**_PANASONIC_** AVIONICS CORPORATION

3303 Monte Villa Pkwy

Bothell, Washington 98021-8969

United States

## Communications

**Telephone:** 425-415-9000
**Fax:** 949-462-7100
**Website:** *www.panasonic.aero*

## Company Identifiers

**HOOVER ID:** 111466

## Company Information

**Legal Status:** Subsidiary
**Employees:**

**EMPLOYEES:** 500

## Executives

**Officers:**

PANASONIC AVIONICS CORPORATION; Hoover's Company Records - In-depth Records

| OFFICER | TITLE | AGE | SALARY | BONUS | TOTAL_COMPENSATION |
|---------|-------|-----|--------|-------|--------------------|
| Brinder Bhatia | Executive Vice President | - | - | - | - |
| Jan Ruderman | Vice President, Government Sector | - | - | - | - |

PANASONIC AVIONICS CORPORATION; Hoover's Company Records - In-depth Records

## Description

**_Panasonic_** Avionics takes entertainment to new heights. The company, which is a subsidiary of **_Panasonic_** Corporation of North America, makes in-flight entertainment and communications systems that allow airborne passengers to get their fix of live TV, movies, music, interactive games, and travel guides. Its Global Communications Suite and X Series offer internet access, telephone service, and broadband connectivity. These systems are usually installed either overhead or in airplane seatbacks. Customers include most commercial airline carriers and aircraft manufacturers, such as Airbus and Boeing.

Operations

**_Panasonic_** Avionics designs and builds its systems for both commercial and private aircraft. In addition to its in-flight entertainment products, the company offers services that include maintenance and repair, interactive software engineering, systems installation, training, and a 24/7 customer support center.

Geographic Reach

**_Panasonic_** Avionics has operations in the US, Asia, Australia, Europe, and the Middle East.

Sales and Marketing

Customers who enjoy the company's in-flight entertainment offerings include Virgin Atlantic Airways, which is the first UK long-haul airline to deploy **_Panasonic_** Avionics' Communications Suite (broadband, phone service, and entertainment portal) across its leisure fleet. Other customers include Hong Kong Airlines and Air New Zealand, as well as Lufthansa and ANA Holdings' All Nippon Airways. Cathay Pacific Airways is the first Asia-based commercial airline to deploy the company's Communications Suite across its entire fleet, including its subsidiary Dragonair's aircraft.

Strategy

The company grows through product innovation, acquisitions, joint ventures, and securing long-term contracts with end users. In 2012 **_Panasonic_** Avionics acquired control of AeroMobile Communications, LTD. The transaction underscores **_Panasonic_**'s commitment to AeroMobile and to its eXPhone product, which is a key element in the company's long term in-flight connectivity and communications strategy. eXPhone is offered by **_Panasonic_**, in collaboration with AeroMobile's in-flight mobile phone service. It allows passengers to use their mobile phones, smart phones and BlackBerry devices to make and receive voice calls and SMS text messages in flight, along with data services such as emails.

That year **_Panasonic_** Avionics announced a 10-year contract with Aeromexico for technical services that will support the airline's fleet of 737-800 aircraft.

In 2010 the company combined its technologies with those of Lufthansa Technik (a Lufthansa subsidiary) to create a new business named idair. The joint venture will develop, manufacture, and sell in-flight systems for entertainment, communications, and cabin management for aircraft designed with the VIP customer in mind. Slated for incorporation are such products as iPod and iPhone controls, ipTV, media and game libraries, among many others.

Company Background

**_Panasonic_** Corp. expanded into the field of avionics in 1979.

**Industry Type:**

**HOOVER INDUSTRIES:**

   *Manufacturing Sector*

   *Transportation Equipment Manufacturing*

PANASONIC AVIONICS CORPORATION; Hoover's Company Records - In-depth Records

*AEROSPACE PRODUCTS & PARTS MANUFACTURING*

*Audio & Video Equipment Manufacturing*

*Electronic Toys & Games Manufacturing*

## Market And Industry

**NAICS Codes:**

423430 - Computer and Computer Peripheral Equipment and Software Merchant Wholesalers
**SIC Codes:**

5045 - Computers, peripherals & software
**Markets:**
 Selected Products and Services
 Apple iPod application
 Audio and video
 ConnectingGate
 Crew forms
 Games
 In-flight communicator
 In-flight surveys
 Live text news
 Onboard hospitality
 Onboard shopping
 OneMedia
 ***Panasonic*** pay per access
 ***Panasonic*** payment system
 SeatChart
 SkyOffice
 USB media player
Voyager
**Competitors:**
 OnAir
 Thales Aerospace

 *Rockwell Collins*
 ASI Entertainment

## Service Firms

**Auditor:** KPMG AZSA & Co.

## Classification

**Subject:** AIRLINES (92%); WIRELESS INDUSTRY (90%); AVIONICS (90%); SMARTPHONES (89%); MOBILE & CELLULAR TELEPHONES (89%); MOBILE & CELLULAR COMMUNICATIONS (89%); TELECOMMUNICATIONS EQUIPMENT (78%); WEBSITES & PORTALS (78%); ENGINEERING (78%); DIGITAL AUDIO EQUIPMENT (77%); COMPUTER SOFTWARE (77%); TOYS & GAMES (77%); WIRELESS TELECOMMUNICATIONS CARRIERS (76%); AIRCRAFT MAINTENANCE REPAIR & OVERHAUL (76%); COMPUTER NETWORKS (76%); BROADBAND (76%); AIRCRAFT MFG (76%); TELEVISION PROGRAMMING (72%); COMPUTER GAMES (72%); INTERNET & WWW (71%); TEXT MESSAGING (66%); SOFTWARE DEVELOPMENT & ENGINEERING (54%)

PANASONIC AVIONICS CORPORATION; Hoover's Company Records - In-depth Records

**Company: _PANASONIC_** AVIONICS CORP (91%％)



Hoover's Company Records - In-depth Records
Copyright 2017  Hoover's Inc., All Rights Reserved

**End of Document**

# EXHIBIT 3

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Western District of Washington

| | | |
|---|---|---|
| Lufthansa Technik AG | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| Panasonic Avionics Corporation | ) | |
| | ) | |
| *Defendant* | ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    Panasonic Avionics Corporation, 3303 Monte Villa Parkway, Bothell, WA  98021

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A

| Place: Byrnes, Keller, Cromwell, 1000 Second Avenue, 38th Floor, Seattle, WA 98104 | Date and Time: |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

_____          OR          _____
*Signature of Clerk or Deputy Clerk*                              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____.

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                           *Server's signature*

                                                    _____
                                                           *Printed name and title*

                                                    _____
                                                           *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
       **(i)** is a party or a party's officer; or
       **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
       **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
       **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
       **(i)** fails to allow a reasonable time to comply;
       **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
       **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
       **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
       **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

       **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
       **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
       **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
       **(i)** expressly make the claim; and
       **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Exhibit A to Subpoena Directed to Panasonic

### Definitions

"Panasonic" or "You" shall mean Panasonic Avionics Corporation, located at 3303 Monte Villa Parkway, Bothell, WA 98021, and all predecessors, successors in interest, assignees; and all directors, officers, employees, agents, representatives, and/or partners of the aforementioned entity.

"Astronics" or "AES" shall mean Astronics Advanced Electronic Systems, located at 12950 Willows Road, NE, Kirkland, WA 98034, and all predecessors, successors in interest, assignees; and all directors, officers, employees, agents, representatives, and/or partners of the aforementioned entity.

"Document(s)" shall be defined to the fullest extent permitted by Federal Rule Civil Procedure 34 and case law interpreting it.

The words "and," "or" and "and/or" shall be construed conjunctively or disjunctively as is necessary to make the request inclusive rather than exclusive.

### Instructions

Panasonic is requested to produce Documents in the following categories that are in Panasonic's possession, custody or control, in their entirety and without redaction or expurgation. "Possession, custody or control" shall be construed to the fullest extent provided under Federal Rules of Civil Procedure 34 and 45 and shall include those Documents within the United States that Panasonic has the ability to demand or to gain access to in the ordinary course of business, including its parent(s) and/or subsidiar(ies).

If any Document is withheld based upon a claim of privilege or other protection, provide for each such Document: (i) the date of the Document, (ii) the names of all authors, (iii) the names of all recipients, (iv) the names of all cc and/or bcc recipients, (v) the type of Document, (vi) a description of the Document (vii) an identification of the privilege or protection claimed and (viii) a brief explanation of the basis of your claim of privilege or other protection.

Documents shall not be withheld on the grounds that they contain highly sensitive or confidential information, but instead shall be designated in accordance with the terms of the proposed protective order, Exhibit 4 to Lufthansa's Application for Discovery, filed September 25, 2017.

## Documents Requested

1.  Documents, including but not limited to purchase orders, specifications, and statements of work, sufficient to show the dates of the first purchases by Panasonic of Astronics' 110V in-seat power systems for installation in Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan.

2.  Documents, including, but not limited to purchase orders, specifications, and statements of work, sufficient to show for each year since the first purchases by Panasonic of Astronics' 110V in-seat power systems for installation in Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan, the number of units purchased by Panasonic from Astronics and the prices paid  and/or other compensation provided by Panasonic to Astronics for those units.

3.  Documents, including but not limited to purchase orders, specifications, and statements of work, sufficient to show, for each year since the first purchases by Panasonic of Astronics' 110V in-seat power systems for installation in Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan, that Astronics knew or should have known that the units it sold were going to be installed on a specific aircraft type, such as, but not limited to the Airbus A320, A330, A380, and the number of units sold that Astronics knew or should have known would be installed in each Airbus aircraft type.

4.  Documents, including but not limited to purchase orders, specifications, and statements of work, sufficient to show, for each year since the first purchases by Panasonic of Astronics' 110V in-seat power systems for installation in Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan, that Astronics knew or should have known that the units it sold were going to be installed on Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan, and the number of units sold that Astronics knew or should have known would be installed in each of those countries.

5.  All contracts between Astronics and Panasonic involving the purchase of 110V in-seat power systems for installation on Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan.

6.  All statements of work between Astronics and Panasonic involving the purchase of 110V in-seat power systems for installation on Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan.

7.  All specifications that Airbus provided to Panasonic, or that Airbus provided to Astronics and that are in Panasonic's possession, custody or control, for 110V in-seat power systems to be installed on Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan.

8.  Documents sufficient to show flight hours and cycles for specific Airbus aircraft types that have installed 110V in-seat power systems that Panasonic purchased

from Astronics for installation in Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan.

9.    Documents sufficient to show all part numbers of 110V in-seat power systems purchased by Panasonic from Astronics for installation in Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan, from the time of the first such purchases to the present.

10.   Documents sufficient to show all documentation for each different 110V in-seat power system part number purchased by Panasonic from Astronics for installation in Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan, from January 2014 to the present, including but not limited to, maintenance manuals, circuit diagrams, and software specifications.

11.   Documents sufficient to show all software code for each different 110V in-seat power system part number purchased by Panasonic from Astronics for installation in Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan, from January 2014 to the present.

12.   Physical samples of each different 110V in-seat power system part number purchased by Panasonic from Astronics for installation in Airbus aircraft in the United Kingdom, France, Spain, Germany or Japan, from January 2014 to the present.

# EXHIBIT 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Application of LUFTHANSA TECHNIK AG, Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery, Pursuant to the Federal Rules of Civil Procedure, of Respondent Panasonic Avionics Corporation for Use in Foreign Proceedings. | ) ) ) ) ) ) ) ) ) ) | No. _____ PROPOSED PROTECTIVE ORDER |

PROPOSED PROTECTIVE ORDER - 1

WHEREAS the disputes between these parties arise in a highly competitive industry in which constant innovation and research are necessary, that disclosure of material relating to innovation and research could cause decided competitive harm or unfair competitive advantage, and that therefore good cause exists for entry of a protective order regarding confidentiality of trade secret or nonpublic technical, commercial, financial, personal, or business information that is expected to be produced or provided in the course of discovery;

WHEREAS the applicant in this action, Lufthansa Technik AG ("Lufthansa"), recognizes that in response to its requests for discovery under 28 U.S.C. § 1782, Respondent, Panasonic Avionics Corporation ("Panasonic"), may be required to disclose such confidential or sensitive business information;

WHEREAS the information sought in this action is for the express purpose of aiding civil proceedings currently pending in Germany—an infringement action, Civil Law Proceeding No. 7 O 289/10, before the Mannheim Regional Court, and any appeals there from—("the German Proceedings");

WHEREAS Lufthansa reasonably contemplates bringing subsequent actions in France, Spain, the United Kingdom, and Japan to enforce its patent rights ("the Contemplated Foreign Proceedings"); and

WHEREAS such sensitive information should be treated as confidential, but not restricted in such a way as would impede Lufthansa's ability to use the discovered information to aid of the aforementioned German proceeding or Contemplated Foreign Proceedings;

NOW, THEREFORE, it is hereby ordered as follows:

## **DEFINITIONS**

"Receiving party" shall be defined as the party receiving discovery materials or information.

"Producing party" shall be defined as the entity that is asked to produce discovery materials or information.

[PROPOSED] PROTECTIVE ORDER - 1

## SCOPE OF THIS ORDER

1.     Designation of confidential information must be made by stamping, placing, or affixing on the document in a manner which will not interfere with its legibility the word "ATTORNEY'S EYES ONLY."  One who provides confidential material may designate it as "ATTORNEY'S EYES ONLY" only when such person/entity in good faith believes it contains trade secrets or nonpublic technical, commercial, financial, personal, or business information. Except for documents produced for inspection at the party's (or its counsel's) facilities, the designation of confidential information must be made prior to, or contemporaneously with, the production or disclosure of that information. In the event that documents are produced for inspection at the party's (or its counsel's) facilities, such documents may be produced for inspection before being marked "ATTORNEY'S EYES ONLY."  Once specific documents have been designated for copying, any documents containing confidential information will then be marked "ATTORNEY'S EYES ONLY" before delivery to the party who inspected and designated the documents.  There will be no waiver of confidentiality by the inspection of confidential documents before they are marked "ATTORNEY'S EYES ONLY" pursuant to this procedure.

a.     Any party may obtain confidential treatment for any information disclosed in this litigation, subject to the right of challenge by another party, in accordance with the provisions of this Protective Order.

b.     If a producing party discovers after the production of a document that it has inadvertently failed to designate the document as "ATTORNEY'S EYES ONLY," it may within thirty (30) days after production give written notice to the receiving party that the document is confidential material, whereupon (i) the receiving party shall, to the extent possible, retrieve all copies of the inadvertently produced document from any person or persons in possession of such copies and return them to the producing party; (ii) the producing party will simultaneously provide copies of the same document with each page marked "ATTORNEY'S EYES ONLY,"

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

and (iii) thereafter the parties shall treat such document as "ATTORNEY'S EYES ONLY."

2.    Portions of depositions of a party's present and former officers, directors, employees, agents, and representatives must be deemed confidential by notice only if they are designated as "ATTORNEY'S EYES ONLY" when the deposition is taken. If a party discovers after the conclusion of a deposition that it has inadvertently failed to designate the deposition testimony as "ATTORNEY'S EYES ONLY," it may designate the testimony as such by writing to counsel for the opposing parties within thirty (30) days after the conclusion of the deposition. Prior to the expiration of the thirty (30) day period, the parties shall treat the entire deposition testimony, transcript, and exhibits as if they had been designated as "ATTORNEY'S EYES ONLY."

4.    No person shall disclose any information or document designated as "ATTORNEY'S EYES ONLY" under this Protective Order to any other person, except as follows:

a.    Disclosure may be made to outside counsel for the parties who have submitted to this court's jurisdiction, as well as to legal assistants, clerical assistants, and support staff for such counsel.

b.    Disclosure may be made to in-house counsel for Lufthansa directly involved for the German Proceedings or Contemplated Foreign Proceedings, and Andrew Muirhead, Vice President Original Equipment Innovation at Lufthansa, provided that each such individual shall sign a written Confidentiality Statement in the form attached as Exhibit A to this Protective Order indicating (a) that he/she has read and understands this Protective Order; and (b) that he/she shall be bound by the terms of the Protective Order.

c.    Disclosure may be made to court reporters engaged for depositions and those persons, if any, specifically engaged for the limited purpose of making photocopies of documents. Prior to disclosure to any such court reporter or person engaged in making photocopies of documents, such person must agree to be bound by the terms of this Protective

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Order.

    d.  Disclosure may be made to consultants, investigators, or experts (hereinafter referred to collectively as "experts") who are engaged to assist in the preparation and trial of the German Proceedings or Contemplated Foreign Proceedings.  Any such expert shall not be an employee of a party.  Any such expert shall be identified in writing in a notice that is received by counsel for the producing party at least five (5) business days in advance of any disclosure. If, within five (5) business days after such notice is received, an objection is filed by the producing party in this Court to such disclosure, then no such disclosure shall be made without further order of this Court. Before disclosure is made to any expert, he or she shall sign a written Confidentiality Statement in the form attached as Exhibit A to this Protective Order indicating (a) that he or she has read and understands this Protective Order; and (b) that he or she shall be bound by the terms of the Protective Order.

    e.  Disclosure may be made to deponents and their counsel during depositions.

    f.  Disclosure may be made to a court in the German Proceedings or Contemplated Foreign Proceedings, provided that the party making the disclosure shall give the producing party notice at least five (5) business days in advance of such disclosure. If, within five (5) business days after such notice is received, the producing party does not file a motion with this court objecting to the disclosure and showing good cause as to why the information shall be withheld, then such disclosure shall be made without further order of this court.  If this Court determines that there is good cause for keeping the documents or other information sought to be disclosed confidential in the German Proceedings or Contemplated Foreign Proceedings, then the party seeking to make the disclosure in the German Proceedings or Contemplated Foreign Proceedings may not do so unless it obtains specific authorization, in advance, from this Court to do so.  In evaluating such a request, this Court will consider the extent to which additional protections (beyond those contained herein) are necessary to insure confidentiality for the documents or other information in the German Proceedings or Contemplated Foreign

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington  98104
(206) 622-2000

Proceedings.

g.     Disclosure may be made to this Court, its clerks and staff by filing the information or document designated as "ATTORNEY'S EYES ONLY" (or any substantive reference to it in any other submission) under seal in the manner provided in Paragraph 7.

h.     Disclosure may be made to independent litigation support services, including document reproduction services, computer imaging services, and demonstrative exhibit services. Prior to disclosure to any such services, such services must agree to be bound by the provision of this Protective Order requiring that the documents and information be held in confidence.

5.     Except as provided in Paragraph 4, counsel for the parties (in the German Proceedings, Contemplated Foreign Proceedings, and this litigation) must keep all documents designated as "ATTORNEY'S EYES ONLY" which are received under this Protective Order secure within their exclusive possession.  Each person to whom information designated as "ATTORNEY'S EYES ONLY" is disclosed shall be informed of the terms of this Protective Order and agree to be bound by it before disclosure to such person of any such information.

6.     All copies, duplicates, extracts, summaries, or descriptions (hereinafter referred to collectively as "copies") of documents or information designated as "ATTORNEY'S EYES ONLY" under this Protective Order, or any portion thereof, must be immediately affixed with the word "ATTORNEY'S EYES ONLY" if that word does not already appear.

7.     To the extent that any transcripts of depositions, exhibits, or any other papers filed or to be filed with this Court in this litigation reveal or tend to reveal information claimed to be confidential, these papers or any portion thereof must be filed under seal in accordance with this Court's procedures for filing under seal.

8.     This Protective Order shall be applicable to all information designated "ATTORNEY'S EYES ONLY" pursuant to paragraphs 1 through 2 herein and produced by any party pursuant to deposition, requests for production of documents, subpoenas, or other discovery

[PROPOSED] PROTECTIVE ORDER - 5

requests (whether formal or informal) in connection with the above-captioned case, and all such confidential information provided by any party in connection with any evidentiary hearings or other proceedings conducted during the course of the above-captioned case.

9.     Compliance with the terms of this Protective Order shall not be deemed an admission that any documents are admissible in evidence and shall not constitute a waiver of objections concerning further use of the documents. Entering into, agreeing to, and/or complying with the terms of this Protective Order shall not (a) operate as an admission by any party that any document or material designated by any other party as "ATTORNEY'S EYES ONLY" contains or reflects proprietary or other confidential matter, or (b) prejudice in any way the right of any party to seek determination by the Court on notice of whether any particular document or material should be designated "ATTORNEY'S EYES ONLY."

10.    If another court or administrative agency subpoenas or orders production of any discovery materials that a party has obtained under the terms of this Protective Order, such party shall promptly notify the party who produced the materials of the pendency of such subpoenas or order, and shall allow the party who produced the materials a reasonable period of time to oppose or quash the subpoena or order before providing the materials to the person or entity seeking them. Compliance with any subpoena or order shall not be deemed a violation of this Protective Order absent the entry, in advance of the response date for the subpoena or order, of a supplemental protective order barring disclosure of the information, and communication of such an order to counsel for the person or entity under subpoena or order.

11.    Within thirty (30) days of the conclusion of the last of the German Proceedings and Contemplated Foreign Proceedings, including any and all appeals, all material not received in evidence and treated as confidential under this Protective Order must be returned to the producing party, or certified to have been destroyed.  This Protective Order shall continue to be binding after the conclusion of this litigation.

12.    A designation of "ATTORNEY'S EYES ONLY" may be challenged by another

Byrnes ◆ Keller ◆ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington 98104
(206) 622-2000

upon motion, and the party claiming the designation bears the burden of showing that the designation is appropriate. A party moving to modify this Protective Order to provide for greater restrictions on disclosure must show that such a modification is necessary to protect the movant's interests.

13.     In the event that any of Respondent's information designated "ATTORNEY'S EYES ONLY" pursuant to paragraphs 1 through 2 of this Protective Order is submitted as evidence in the German Proceedings or Contemplated Foreign Proceedings access will be limited to those persons identified in Paragraph 4.

14.     This Court shall retain jurisdiction of this matter for the purpose of enforcing and/or modifying, altering, and/or amending the scope of this Protective Order. Lufthansa shall assure compliance with this Protective Order by its representatives and Lufthansa shall be responsible for any violation of this Protective Order by its counsel.

15.     Confidential information that originated with a third party and is subject to the terms of any confidentiality obligation to that third party, may be designated "ATTORNEY'S EYES ONLY," and shall, once designated, be subject to the restrictions on disclosure specified herein.

16.     Inadvertent production of documents, things or information subject to attorney-client privilege, work-product immunity, or any other applicable privilege or immunity shall not constitute a waiver of, and shall not otherwise prejudice any claim that such material or related material is privileged, protected as attorney work product, or is otherwise immune from discovery, provided that the producing party or third party notifies the receiving party in writing promptly after discovery of such inadvertent production.  Such inadvertently produced documents and things and all copies thereof shall promptly be returned to the producing party or third party upon request.  After a request for the return of the inadvertently produced documents and things is made by a producing party or third party, no use shall be made of such documents and things other than to challenge the propriety of the asserted privilege or immunity, nor shall they be

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington  98104
(206) 622-2000

shown or disclosed to any person who had not already been given access to them before receipt of the request to return them.  No demonstration or proof of error, inadvertence, excusable neglect, or absence of negligence shall be required of the producing party or third party in order for such party to avail itself of the protection and provisions of this paragraph.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1

Entered this _____ day of _____, 2017.

2

3

_____
United States District Court Judge

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

[PROPOSED] PROTECTIVE ORDER - 9

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

In the Matter of the Application of ) No. _____
LUFTHANSA TECHNIK AG, Petitioner, for )
an Order Pursuant to 28 U.S.C. § 1782 to Take )
Discovery, Pursuant to the Federal Rules of )
Civil Procedure, of Respondent Astronics )
Advanced Electronic Systems for Use in )
Foreign Proceedings. )
)
)
_____ )

## **CONFIDENTIALITY STATEMENT**

UNDERTAKING OF _____

STATE OF _____ )
                                 )ss.
COUNTY OF _____ )

I, _____, being duly sworn, state that:

My address is _____.

My present employer is _____.

My present occupation or job description is _____.

I have received a copy of the protective order in this case signed by district judge

_____ on _____.

I have carefully read and understand the provisions of the protective order.

I will comply with all of the provisions of the protective order.

I will hold in confidence, and not disclose to anyone not qualified under the protective

order, any confidential information or information derived therefrom, including words substance

summaries, abstracts or indices of confidential information disclosed to me.

I shall return all materials containing confidential information and summaries, abstracts,

and indices thereof, and copies thereof, which come into my possession, and document or things

which I have prepared relating thereto, to counsel for the party by whom I am employed,

retained, or otherwise designated as a qualified person.

[PROPOSED] PROTECTIVE ORDER - 10

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington 98104
(206) 622-2000

1    I hereby submit to the jurisdiction of this court for the purpose of enforcement of the

2 protective order in this case.

3 Dated: _____

4                  Signature

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000